Mrs. Frozie Guidry DUET, Plaintiff,

v.

LOUISIANA POWER & LIGHT COM-
PANY, Defendant.

Earl GUIDRY, Plaintiff,

v.

LOUISIANA POWER & LIGHT COM-
PANY, Defendant.

Civ. A. Nos. 7036, 7037.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 30, 1958.

Cicero C. Sessions, Frank J. Stich, Jr., New Orleans, La., Edward T. Diaz, Golden Meadow, La., for plaintiffs.

Monroe & Lemann, Andrew P. Carter, New Orleans, La., for defendant.

J. SKELLY WRIGHT, District Judge.

These cases, consolidated for trial, are suits for damages arising out of the construction of an electric transmission line across plaintiffs' property by the defendant Louisiana Power & Light Company. Mrs. Duet and Earl Guidry, brother and sister, are adjoining landowners. Their property, taken together,[1] has a 192' front on the left descending, or east, bank of Bayou Lafourche and runs in a generally easterly direction between parallel lines approximately 8,000'. For the first 1,000' this property may be described as high land in that it is ordinarily dry. The property from 1,000' off the bayou to the rear is typical Louisiana marshland, subject to tidal inundation from time to time.

In 1952 plaintiffs, with the advice and monetary aid of the United States Department of Agriculture, Soil Conservation Service, constructed a drainage canal along the common boundary of their properties. The canal commences where the high land ends and the marshland begins and runs to the rear where

1. The property of each plaintiff measured approximately 96' x 8,000'.

it empties into a district drainage canal. The purpose of the canal between the properties is to drain the high land, the water on the marshland being generally unaffected thereby. The canal is 3 to 4 feet deep, 12 to 18 feet wide with sloping banks and a levee on the south or Guidry side formed with the earth displaced in digging the canal. The cost of constructing the canal was $550, part of which was paid by the U. S. Department of Agriculture. Although designed solely for drainage, the canal is sometimes now used for navigation of small boats such as pirogues and skiffs with small outboard motors. The levee along the canal is used as a cattle walk from the high land in front part of the property through the marshland to a relatively high area in the rear where in some seasons cattle are able to graze.

By virtue of judgments of expropriation in state court proceedings, the Louisiana Power & Light Company obtained an "easement (100 feet wide) over and across the tract of land" owned by plaintiffs. The easement is 3,600' off Bayou Lafourche and runs generally parallel to it, across the marshland part of the property. As to the land of each plaintiff, it measures 100' wide and 103' long, being on a slight diagonal across the 96-foot-wide tracts. The state court judgments further provided that "the rights of plaintiff are over and across, with the right of ingress and egress, on the tract of land * * *." Across the right of way, and others similarly acquired from adjoining property holders, this defendant power company had constructed, through an independent contractor, a high voltage electric transmission line suspended from 2-pole "H" frame supports placed several hundred yards apart through the marshland. During the construction, marshbuggies and a dragline of the independent contractor crossed the right of way, the levee and the canal on plaintiffs' property. In so doing the weight of this equipment compacted and lowered the level of the levee and cut away a portion of the north bank of the canal. Some of the

earth from the banks slipped into the canal thereby decreasing its depth in the part affected. Marshbuggy impressions were left in the marsh, and in a few instances, since the property is not well marked, some of the contractor's equipment may have trespassed outside the right of way.

Under the contract with the power company, the independent contractor erecting the transmission line was required, after construction, to proceed with clean-up activities along the route of the line, repairing any damage to the property caused by the work. In early November 1956 this clean-up phase of the construction operation reached the properties of the plaintiffs. Defendant's contractor obtained the construction plans of the drainage canal from the U. S. Department of Agriculture and set about restoring the canal in accordance with those plans. By using a dragline, spoil which had slipped into the canal during construction was scooped out and deposited on the depressed levee, on the earth between the levee and the south bank of the canal, on the north bank of the canal, and at those locations in the marsh where ruts had been caused by the passage of the marshbuggies. The earth thus deposited was then tamped with the crane bucket of the dragline to give compaction to the soil. In the course of time the vegetation of the marshland has grown again on this fresh soil on the banks of the canal and on the levee.

As a result of this restoration work, the slightly more than 100 feet of canal damaged in construction was repaired. The banks were re-established and the levee returned to its original height and width. The canal at the point of the intersection with the right of way is now somewhat wider than it was before construction of the transmission lines, but this widening has not in any way interfered with its use for drainage or by small boats. The only remaining damage to the properties of the plaintiffs resulting from construction of the transmission lines are several small holes in

the levee within the right of way area apparently caused by cattle sinking into the levee in places where the earth has not completely compacted. The cost of repairing this damage is estimated at $100.

Plaintiffs maintain that their land, including the canal and levee thereon, has been damaged in the area of the right of way in the construction of the transmission lines, and that the defendant has failed to repair that damage. They charge also that some of the marsh-buggies used by the independent contractor in his construction line were operated outside the right of way. To this extent plaintiffs charge the defendant with trespass and ask damages therefor. The defendant, on the other hand, contends that it has made a reasonable use of its 100′ right of way over the plaintiffs' property, that the damage caused thereto by the construction of the transmission line has been repaired, and that the plaintiffs are really trying to mulct the power company in damages. They cite, for example, the fact that although the entire canal extending over 4,000′ cost only $550 to build, plaintiffs are asking $22,600 for damage to the slightly more than 100 feet of the canal crossing the defendant's right of way. The defendant alleges that the plaintiffs made money demands on it before the independent contractor came through with its final clean-up, that these money demands have continued, culminating in the filing of this litigation.

 It is settled in Louisiana, as elsewhere, that one having an easement or servitude on another's land is bound to use that easement or servitude in such manner as not unreasonably to injure the right of the owner of the servient estate,[2] and that if the owner of the easement or servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may maintain an action for damages resulting from such use.[3] It is recognized, of course, that even with maximum care, damage, and sometimes inconvenience, to the servient estate is inevitable in the exercise of rights under the servitude. The obligation of the owner of the servitude is not to cause no damage, but to cause "the least possible damage." LSA–C.C. Art. 774.[4] The obligation to cause the least possible damage involves the responsibility of returning the premises to its original condition so far as reasonably possible. It was pursuant to this latter obligation that in the final, or clean-up, phase of the construction operation, the independent contractor undertook to repair the damage along the right of way caused by the construction. The question here presented is simply whether this has been done.

Plaintiffs' witnesses conisted primarily of plaintiffs themselves and Stanley Duet, the son of the plaintiff Duet and the nephew of the plaintiff Guidry. These witnesses testified as to the damage to the property caused by the construction. They stated further that the damage had not been repaired, that a quagmire condition exists in the marsh area of the right of way, and that it will be necessary to bulkhead the canal in order to return it to its original condition. Plaintiffs produced witnesses who testified that the cost of bulkheading would be from $5,000 to $22,000. Plain-

2. LSA–C.C. Arts. 771, 774; Kerr v. Central Louisiana Electric Co., La.App., 2 Cir., 1952, 59 So.2d 209; Yourtee v. Smith-Hall Lumber Co., 1927, 7 La.App. 313; 28 C.J.S. Easements § 103b; 17A Am.Jur. Easements, § 112.

3. LSA–C.C. Arts. 2315, 2316 and see authorities cited in note 2.

4. LSA–C.C. Art. 774 reads, in pertinent part, as follows:
 "The owner of the estate, to which the servitude is due, has the right to go on the estate which owes the servitude with his workmen, in the place where it is necessary to construct or repair the works necessary for the exercise of the servitude, to deposit there the materials necessary for those works and the rubbish made thereby, under the obligation of causing the least possible damage and of removing them as soon as possible. * * *"

tiffs also complain that, because of the damage to their property caused by the construction crew, they are unable to increase their herd of 40 cattle.

The defendant's witnesses, on the other hand, and particularly the employees of the independent contractor, testified that the property has been returned to the condition it was in prior to construction. They admitted that the canal in the area of the right of way was now slightly wider than it had been originally but denied that this increased width can in any way affect its utility. As to the quagmire conditions, they testified that marshland such as plaintiffs' was a quagmire to begin with. Hence the necessity for marshbuggies. They stated that the impressions made by marshbuggies in the marsh in no way damaged the property. They suggested that one can not even see the impressions because the marsh is usually under water. They testified further that any deep holes in the marsh were caused, not by them, but by a geophysical crew which had been through the property earlier in the year detonating dynamite for geophysical observations.

In view of the conflict in the testimony of the witnesses, and in view of the difficulty inherent in appraising damage to marshland, this Court decided to appoint an expert, a local surveyor familiar with the terrain, to view the property and report his findings. On the suggestion of Mr. Otho LeBlanc, head of the Soil Conservation Service of the U. S. Department of Agriculture in the Bayou Lafourche area, the Court submitted the name of Mr. John F. Hoffman, a registered and licensed civil engineer of Thibodaux, Louisiana, to the parties for their approval as a court-appointed expert. Both parties approved the appointment of Mr. Hoffman as a nonpartisan expert and he was so appointed. Mr. Hoffman viewed the property on two occasions, submitted his report, which is in evidence, and was cross-examined by both sides. Mr. Hoffman testified, in sum, that any damage, which the property has suffered as a re-

sult of the construction of the high voltage line, had been repaired with the exception of certain holes in the levee on the Guidry property where the new soil had not compacted completely. He estimated that at a cost of $100 these holes could be repaired. Mr. Hoffmann's testimony is in accord with the more credible of the party witnesses and is given great weight by this Court.

 It is ordered, therefore, that the claim of Mrs. Frozie G. Duet be dismissed with costs, and that there be judgment in behalf of Earl Guidry against the Louisiana Power & Light Company in the amount of $100 with costs.