343 So.2d 1364 (1977)
Thomas C. FARRELL, Jr., et al.
v.
HODGES STOCK YARDS, INC., et al.
Nos. 58383, 58387.
Supreme Court of Louisiana.
January 24, 1977.
On Rehearing March 3, 1977.
Rehearing Denied April 7, 1977.
*1365 Francis J. Mooney, Jr., Curtis, Foster, Hyde & Mooney, New Orleans, for Louisiana Southern Railway Co.
Sidney W. Provensal, Jr., Provensal & Fitzmaurice, New Orleans, for Thomas C. Farrell, Jr.
Henican, James & Cleveland, for Hodges Stockyards, Inc.
Per Curiam on Rehearing March 3, 1977.
CALOGERO, Justice.
Plaintiffs own certain industrial property in Arabi, Louisiana in the Parish of St. Bernard. Displeased with the presence of certain railroad tracks, switches, and spurs traversing their property, they brought this law suit against two railway companies, Louisiana Southern Railway Company and the New Orleans Terminal Company, as well as Hodges Stock Yards, Inc., a successor in title to an earlier company which had granted in 1891 and 1908, respectively, the rights of way which facilitated placing of the tracks. Plaintiffs' suit seeks the removal of the tracks, and, alternatively, a judgment extinguishing the recorded railway right of way agreements, and, again alternatively, the relocation of the tracks.[1]
Various exceptions were overruled by the trial judge and after trial on the merits, the trial court rendered a judgment cancelling and extinguishing the railway companies' servitudes and rights of way, and further ordering relocation of the servitudes, should plaintiffs elect to relocate them, according to a plan presented in plaintiffs' pleadings.
*1366 All three defendants appealed and the court of appeal affirmed the trial court judgment. 333 So.2d 745 (La.App. 4th Cir. 1976). We granted writs upon application of defendants Louisiana Southern Railway Company and Hodges Stock Yards, Inc., 337 So.2d 878 (La.1976).[2]
The following title history of the property in question is important for an understanding of the case. On March 12, 1891 Crescent City Live Stock Landing and Slaughter House Company, [hereinafter Crescent City Live Stock], owners of a large tract of ground on which was operated at the time a slaughter house and related businesses, granted to a predecessor of Louisiana Southern Railway Company, i.e., New Orleans and Gulf Railroad Company, a right of way over and across the land of the said grantor. In 1893 that original grantor, Crescent City Live Stock, sold the entire tract burdened by the railroad servitude (less certain lots previously sold) to Crescent City Stockyard and Slaughter House Company, Ltd. [hereinafter Crescent City Stockyard]. In April of 1921 that company sold a portion of the tract to Arabi Packing Co., Inc. [hereinafter Arabi] and in June of 1921 sold another portion of the tract to New Orleans Stock Yards, Inc. Thereafter, in 1960, New Orleans Stock Yards, Inc. sold a portion of its land to plaintiffs. Sometime after 1960, the corporate name was changed from New Orleans Stock Yards, Inc. to Hodges Stock Yards, Inc. [hereinafter Hodges]. Hodges today owns not only that portion of the original tract which in their earlier name, New Orleans Stock Yards, Inc., they had acquired in 1921, but also a portion of the property acquired by Arabi in 1921, which Arabi later sold to International Cold Storage, Inc., a corporation which subsequently merged with Hodges.
At least one part of the Arabi tract is today owned by Earl Doescher Company whose property is burdened by the railroad servitude and which enjoys rail service. Rail service is additionally being furnished several tenants of defendant Hodges, including Modern Woodcrafts and Ace Box Company. Additionally, Hodges has agreements with certain meat handlers who, it is asserted, also have the right to rail service.
In the 1891 servitude agreement, Crescent City Live Stock granted to the railroad a right of way running fully across its property. The entire instrument follows:
"The Crescent City Live Stock Landing & Slaughter-House Company, a corporation organized under the laws of the State of Louisiana and domiciled in the Parish of St. Bernard, in said State, through its President, Louis Ruch, duly authorized by Resolution of the Board of Directors of said Company, hereto attached, declares:
That in view of the advantages and conveniences accruing to the shippers of cattle, and in consideration of the improvement and increased facilities thus offered to those engaged in the cattle trade on this market; and of the desire of the said Company to promote the interests of said trade, by the construction, operation and maintenance of a switch from the main line of the New Orleans & Gulf Railroad to a point at or near the Slaughter-House and cattle pens of the said Crescent City Live Stock Landing and Slaughter-House Company, as now located upon or near the River Bank, below the City of New Orleans, in the Parish of St. Bernard, it does hereby grant, bargain, convey and deliver the *1367 right of way over and across the land of said Company, as follows:
A strip of land thirty feet in width, beginning at such a point on the line of said New Orleans & Gulf Railroad as may be selected by the General Manager of the said Crescent City Live Stock Landing and Slaughter House Company and continuing through the lands of the said Crescent City Live Stock Landing and Slaughter House Company to a point to be selected by said Slaughter House Company, at or or [sic] near their present buildings, to the New Orleans and Gulf Railroad Company, a corporation under the laws of the State of Louisiana, domiciled in the City of New Orleans, its successors and assigns, for the purpose of constructing and operating aforesaid switch.
The right of way which is hereby granted is thirty feet in width or fifteen feet on either side of the centre line of said switch, from the point at which the said switch shall enter the land of the Slaughter House Company to Royal Street, fifty feet in width at this point, thence decreasing gradually to thirty feet at the terminus of the switch, in line with the receiving pens of the said Slaughter House Company, the whole as may be finally located and constructed by the said New Orleans & Gulf Railroad Company, its successors and assigns, through the said before described strip of land; provided such line and location be agreed to by said Crescent City Live Stock Landing and Slaughter House Company, and this grant of way shall be exclusively used for operating cattle-cars and such other rolling stock as may be required for the purposes of cattle yards and slaughter houses and attendant factories, and shall continue in full force as long as the said property of the said Crescent City Live Stock Landing & Slaughter House Company shall be used for the business for which it is now used or any other of like nature and no longer. The said Slaughter house Company reserving to itself the right to cancel and annul the right of way herein granted, whenever it shall select itself or be compelled to change the nature of the business now conducted on said property or that it shall cease to operate at that point cattle-yards or slaughterhouses; or desire to make a conveyance of said property; provided that the expenses incurred by the said New Orleans & Gulf Railroad in constructing and maintaining the said switch be refunded by said slaughterhouse Company, in the event of the right of way being thus cancelled and annulled prior to ten years from this date. The amount of such expenses to be determined by the actual payments made for said work by the New Orleans and Gulf Railroad Company and, in any dispute, by arbitration.
"The New Orleans & Gulf Railroad Company, in accepting the grant of a right of way, hereby agrees and promises to construct all necessary road-crossings and cattle-guards; to construct and maintain fences along both sides of the track, with openings properly guarded at the points designated by the General Manager of the Slaughter-House Company, and obligates itself not to impair the drainage of the lands of the Crescent City Live-Stock Landing & Slaughter-House Company; and also agrees that said Crescent City Live Stock Landing & Slaughter-House Company, or their successors, may be permitted to occupy any lands embodied in this grant not needed by the New Orleans & Gulf Railroad Company for its purposes and should such permission be granted, it is to be used in such manner as not to interfere in any way whatever with the management of the said railroad or with the property of said railroad in the right of way herein and hereby conveyed, except as hereinabove provided. Itself (sic) to hold the Slaughterhouse Company harmless from any damages to person or persons, animals or property that may occur on that portion of land the use of which is hereby granted to said railroad Company, through the fault or negligence of its own, agents or employees.
"It is agreed that any violation of the foregoing contract shall be reported to *1368 the railroad Company or its General Manager and if after fifteen days' notice the Railroad Company fail to comply with the terms of this contract, then the said Crescent City Slaughter House Company shall be entitled to annul and cancel the said contract, without the necessity of placing the said Railroad Company in default and empower the said Slaughter House Company to reenter into immediate possession of the herein granted right of way and to remove the material there belonging to said railway Company, at the cost and expense of said railway Company." [emphasis added]
Plaintiffs argue that the 1891 instrument contained an automatic dissolving condition: namely, that "this grant of way . . . shall continue in full force as long as the said property . . . shall be used for the business for which it is now used or any other of like nature and no longer." They argue that no cattle has rolled over Louisiana Southern Railway Company tracks since 1966 and that the property has not been used for cattle yards or slaughter houses since about 1963. Plaintiffs contend that there has thus occurred an automatic dissolution of the conventional servitude and that accordingly they are entitled to have the tracks removed from their property.
Plaintiffs' position was upheld in the courts below, the Court of Appeal relying on Article 783 of the Louisiana Civil Code which provides in part that: "Servitudes are extinguished ... by the happening of the dissolving condition attached to the servitude."
Our threshold consideration, therefore, is whether the 1891 contract as properly construed provides for an automatic dissolution of the servitude. When we examine the contract, we find that there is no express calendar term for the period during which the right of way is to continue. The purpose for which the right of way is to be used is said to be "exclusively" for operating cattle cars and such other rolling stock as may be required for the purpose of cattle yards and slaughter houses and attendant factories. There follows the language relied upon by the lower courts which is to the effect that the right of way shall continue in full force as long as the property shall be used for the business for which it is now used or any other of like nature and no longer. If construed to mean that at such time (when the property is no longer used for a "like" business) the right of way shall automatically dissolve, the provision conflicts with the immediately succeeding sentence, actually grammatically a clause or continuation of the preceding sentence, which states: "The said Slaughter house Company reserving to itself the right to cancel and annul the right of way herein granted, whenever it shall select itself or be compelled to change the nature of the business" or shall cease to operate cattle yards or slaughter houses or desire to make a conveyance of the property. If the preceding sentence means that the right of way shall automatically dissolve when the property of the grantor is no longer used for the business for which then used, there would be no reason for the grantor's reserving to itself the right to cancel and annul the right of way whenever grantor should elect or be compelled to change the nature of the business being conducted on the property, or cease to operate cattle yards or slaughter-houses, or sell the property.[3]
If the right of way were intended to dissolve automatically if use of the property were to be substantially changed, then there would be no reason to give grantor "the right to cancel and annul" the servitude *1369 whenever it should voluntarily or involuntarily change the nature of the business or cease to operate cattle yards or slaughterhouses, or whenever it should sell the property.
Contracts are to be construed to give compatible meaning to all clauses. "All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act." La. C.C. art. 1955. Furthermore, it seems evident from a reading of the entire agreement that it was prepared by the grantor; in any event the possibly ambiguous provisions should not be construed against the railroad.
Attempting to give meaning to both provisions and the balance of the instrument in a sensible and reasonable way, we believe that the words convey the following meaning:
The grant of this right of way is for an indefinite term. The railroad may insist on continuing the right of way in full force and effect, but only so long as and no longer than while the property of the grantor shall be used for the business for which now used or any other of like nature. On the other hand, grantor reserves unto itself the right to cancel and annul, or not to do so, in the event it chooses to or is compelled to change the nature of the business or ceases to operate cattle yards or slaughter houses or simply wants to convey the property.
If the right of way is cancelled by grantor within ten years for any of the foregoing reasons, the railroad is entitled to be reimbursed its expenses in constructing and maintaining the tracks. Even if the grantor may not cancel because none of the foregoing should come to pass, i.e., voluntary or compelled change in the nature of the business, cessation of operation of cattle yards or slaughter houses or sale of the property, grantor may nonetheless cancel the right of way agreement in the event the railroad violates any provision of the agreement and fails to comply after having received fifteen days notice to do so.
The provisions of the contract which the railroad might violate are these: 1) use of the right of way other than for operating cattle cars and such other rolling stock as may be required for cattle yards and slaughter houses and attendant factory purposes; 2) failure to construct necessary road crossings and cattle guards; 3) failure to construct and maintain fences along both sides of the track with openings properly guarded at the point designated by the general manager of the grantor; and 4) impairment of drainage of the lands of the grantor.
When we examine the facts of this case in light of the interpreted contract provisions, what we find, first, is that the property is no longer being used for the slaughter house business.[4] Moreover, since at least 1936 the railroad and its customers at this site have used the right of way, not exclusively for operating cattle cars and such other rolling stock, but for the carriage of other commodities as well. Since 1966 no cattle have been conveyed over the tracks.
Thus for many years the exclusive use provision of the right of way grant has been violated, and grantor's property has not been used since 1963 for the business for which used at the time of the grant or any other of like nature. And until the institution of this lawsuit by successors in title to a portion of grantor's original property, neither the grantor nor any successor has judicially or otherwise sought to exercise the right to cancel and annul the singular right of way granted in 1891. Rather, during this time, and right through the present, grantor, its successors (Crescent City Stockyard, New Orleans Stock Yards, Inc. and Hodges Stock Yards, Inc.), vendees *1370 (Arabi, International Cold Storage, Inc. and Earl Doescher Company), and tenants (including Modern Woodcrafts and Ace Box Company) have enjoyed, presently use, and wish to continue using the existing railroad servitude for their business advantage.
Plaintiffs convinced the court of appeal that the full import of the contract is to be gleaned in that sentence which sets the terms of the servitude as existing only for so long as grantor's property is used for the business for which it was used in 1891. They successfully argued below that Civil Code Articles 783(6) and 821, which provide for the extinguishment of a servitude of right at the "happening of the dissolving condition," govern the contract at issue.
In light of our finding that the proper interpretation of the contract and all its provisions is that there is not provided in this contract any automatic dissolution, but rather nullification at the option of the grantor when and if certain events should occur, we find it unnecessary specifically to consider whether discontinuance of the property's use as a slaughter house was equivalent to Article 783(6)'s "happening of the dissolving condition," and whether such discontinuance fixed the "certain time" which under Article 821 caused a servitude to become "extinguished of right."
There was no automatic dissolution included within the contract. Furthermore, we know of no provisions of law or legal theory which strike with nullity a contract such as the present one where the grantor of a servitude reserves unto himself the authority to cancel and annul the agreement upon the occurrence of events so real, substantial, and foreseeable as change in the nature of the business conducted on the property, cessation of cattle yard or slaughterhouse operations, or conveyance of the property.
Finding that the contract did not automatically dissolve, but that its nullification must have been demanded in order to effect dissolution of the servitude, we turn now to the question of whether plaintiffs, one of several successors to grantor, and owners of only a portion of the original tract burdened with the servitude, may dissolve the servitude as it affects their property, with the attendant result that the servitude is effectively terminated as to the entire tract including property of their opposing neighbors who are also grantor's successors. We find that plaintiffs may not.
There is no question but that plaintiffs purchased their property with full knowledge of the existence of the tracks and servitude on the property. Plaintiff Farrell testified at trial:
"We understood that these tracks on this property we were purchasing was burdened by this right-of-way. We understood that. We further understood, and in our discussions on drawing up the options in Jones, Walker's office, that these rights of way were established by those certified documents."
Farrell also testified that he was aware that the Act of Sale listed the railroad rights of way with which the property was burdened.
When plaintiffs acquired the property[5] from New Orleans Stock Yards, Inc. (vendor's name was later changed to Hodges Stock Yards, Inc.) the 1960 act recited that the transfer was made subject to certain leases and reservations including these:
"(a) The agreement of Switch privileges granted by Crescent City Stock Yard and Slaughter House Company, Limited, and New Orleans Terminal Company, dated August 12, 1908, registered in MOB 17, Folio 158. [This servitude was the one granted to New Orleans Terminal Company, the other railroad with tracks on the property.]
* * * * * *
"(d) Right-of-way, granted by the Crescent City Live Stock Landing and Slaughter House Company, to the New *1371 Orleans Gulf and Railroad Company, of the right-of-way over and across the land of said Company, as more fully shown in Act of Deposit, executed before Gustave Legardeur, Jr., Notary Public, for the Parish of Orleans, State of Louisiana, dated March 17, 1891. [This refers to the servitude granted to the predecessor of defendant Louisiana Southern Railway Company.]
"(e) Agreement entered into by, and between Louisiana Southern Railway Company, and the New Orleans Terminal Company, dated December 15, 1908, recorded in MOB 18, Folio 170. [This agreement is between the two railway companies; in it Louisiana Southern allowed New Orleans Terminal to use a portion of its tracks.]
"(f) The rights-of-way, servitudes and privileges established in the Act whereby the Crescent City Stock Yard and Slaughter House Company, Limited, conveyed other properties in the same location, as per act executed before Conrad G. Collins, Notary Public, dated April 30, 1921, registered in COB 28, Folio 80." [This provision incorporates the servitude established in the 1921 sale to Arabi.]
If the servitude in question here (and we are now talking about the railroad's servitude acquired originally in 1891) were a predial servitude, one which runs from one estate to another, then there would be no question but that plaintiffs alone could not cause removal of the tracks. Article 656 of the Louisiana Civil Code provides that:
"The rights of servitudes, considered in themselves, are not susceptible of division, either real or imaginary. It is impossible that an estate should have upon another estate part of a right of way, or of view, or any other right of servitude, and also that an estate be charged with a part of a servitude.
"The use of a right of servitude may be limited to certain days or hours; but thus limited, it is an entire right, and not part of a right.
"From thence it follows that a servitude existing in favor of a piece of land, is due to the whole of it, and to all the parts of it, so that if the land be sold in parts, every purchaser of a part has the right of using the servitude in toto."

Under this article, when a portion of a piece of property burdened by a servitude is sold, the buyer cannot have the servitude removed, because each of the property owners has the right of use of the entire servitude.
The servitude at issue here is one in favor of a public railroad. Thus, it is not a predial servitude but a limited personal servitude, governed by the rules of predial and personal servitudes, applied by analogy.[6] A. N. Yiannopolous, Usufruct: General Principles, Louisiana and Comparative Law, 27 La.L.Rev. 369 (1967); III Yiannopolous, Louisiana Civil Law Treatise, Personal Servitudes § 125 (1968); see 8 La.L.Rev. 553 (1948); see also Rock Island, A. & L. R. Co. v. Gournay, 205 La. 164, 17 So.2d 21 (1944) in which this Court applied the codal principles of predial servitudes to a conventional servitude in favor of a railroad. When we apply Article 656 by analogy to the conventional servitude now before the Court, we find that the personal servitude created in favor of the railroad is indivisible because its advantage is not susceptible of division, C.C. art. 657, and because every purchaser of a part of the land "has the right of using the servitude in toto." C.C. art. 656. No single owner can gain extinguishment of the servitude. Since only a single owner, plaintiffs herein, brought this action, they have no cause of action to extinguish the indivisible servitude running in favor of the *1372 railroad which is to the advantage of their neighbors.[7]
We do not base our opinion that plaintiffs are without right to nullify the servitude simply upon the indivisibility of the personal servitude granted to the railroad in 1891. There is another reason why plaintiffs cannot succeed. In 1921 a predial servitude, a railway right of way, was established which burdens plaintiffs' property.
In April of 1921, Crescent City Stockyard, plaintiffs' predecessor in title, sold a parcel of its land to Arabi Packing Company. That act of sale recited that:
"This sale is made upon the further terms, conditions, stipulations and agreements, to-wit:
* * * * * *
"(11) The property hereby conveyed to the purchaser herein constitutes part of a larger area surveyed by E. L. Eustis, on Jan. 23rd, 1920, which said survey is made part hereof and paraphed for identification herewith, marked "B." From said survey, it appears that there exist certain switch tracks, spurs, roads, crossings, rights of way, servitudes and privileges between that portion of the property hereby conveyed to the Arabi Packing Co. Inc., and that portion of the property retained by the vendor, Crescent City Stock Yard & Slaughter House Co. Ltd.
"It is hereby stipulated and agreed by and between the parties hereto that there is hereby created for the use and benefit of the property retained by vendor and the successive owners thereof, rights, easements, servitudes, rights of way, in favor of said respective estates, perpetually, to the use of all the track, tracking privileges, roads, road ways, switching privileges, over the property of the Arabi Packing Co. Inc., as shown by the said blue print hereto attached and made part hereof, and as may presently exist.
"(12) On said blue print, marked "B," hereinabove referred to and attached hereto, there appear certain tracks connecting with the New Orleans Terminal Railroad Company and the Louisiana Southern Railroad Company, running across Chartres and Royal Streets and the Block between said streets. And it is hereby agreed that the Arabi Packing Co. Inc., shall have the right to the joint use of said tracks, connecting with the aforesaid Terminal Railroad Company and the Louisiana Southern Railroad Company, insofar as the Crescent City Stock Yard & Slaughter House Co. Ltd., has the right or power to grant such joint use of them. The Arabi Packing Co. Inc. agrees jointly to maintain said tracks. The servitudes, rights and obligations above created shall attach to and follow ownership of the properties to which they relate.

"12-A-The vendor and purchaser, and their successors, shall have the right to change location of all switches, tracks and pipes and spurs, provided similar connections and service as presently exists, shall be maintained, and further provided, that the cost of making any change shall be borne by the party making same." [emphasis added]

* * * * * *
In this agreement of 1921, Crescent City Stockyard granted a predial servitude to Arabi for a railroad right of way over the land it retained. Likewise, Arabi granted to Crescent City Stockyard a predial servitude for a railroad right of way over the land it was purchasing. When Crescent City Stockyard sold to New Orleans Stock Yards, Inc. and when New Orleans Stock Yards, Inc. sold to plaintiffs, that predial servitude created in the 1921 agreement followed the land. It was this agreement, with its attendant predial servitude created upon the whole of the vendor's property, including that portion later sold to plaintiffs, *1373 that was made a particular reservation in the act of sale by which plaintiffs acquired the land in 1960. See section "f" of the "Reservations" in the 1960 act of sale hereinabove. That predial servitude affecting all of vendor's property is indivisible. La.C.C. art. 656. A suit by an owner of a portion of the larger tract retained by vendor and burdened by the predial servitude created in 1921 may not succeed in removing the servitude from the property. In regard to this predial servitude, we note parenthetically, even were Hodges and plaintiffs joined in such effort, they could not extinguish this servitude to the prejudice of the 1921 vendee, Arabi, or Arabi's successors.
For the reasons we have expressed herein, we conclude that there continues to exist over plaintiffs' property the railway right of way granted initially in 1891 to the predecessor of Louisiana Southern Railway Company.
We turn now to the second alternative demand of plaintiffs: that the servitude in question be relocated to a strip bordering the properties which would be less burdensome on plaintiffs as they attempt to change the use of their property. This relocation was, of course, the central issue in plaintiffs' previous suit. See footnote 1. In that opinion, this Court discussed the applicability of Civil Code Articles 703, 753, and 777 to the servitude in question. These articles set out the right of the owner of a servient estate to relocate a servitude across his property which has become more burdensome. Whatever the application of these articles to a conventional limited personal servitude, they are applicable only if the owner of the entire servient estate seeks to relocate the servitude. Just as the plaintiffs, owners of portion of the property which the 1891 grantor burdened with this servitude, could not successfully extinguish the entire indivisible servitude, as explained earlier herein, so too they cannot successfully effect the relocation of that entire indivisible servitude absent concurrence by each of grantor's successors. Considering the record evidence of the opposition of other owners, including defendant Hodges, to the relocation, and considering as well the fact that some owners, successors to grantor, are not even parties to this litigation, we find that plaintiffs cannot in this lawsuit effect the relocation of the tracks to another place on their property.
Accordingly, the judgment of the Court of Appeal, except insofar as it became final as to New Orleans Terminal Company, is reversed. Plaintiffs' lawsuit is otherwise dismissed, plaintiffs to bear all costs of this action.
MARCUS, J., dissents.
SUMMERS, J., dissents and assigns reasons.
SUMMERS, Justice (dissenting).
I do not agree with the finding of the majority that the contract did not automatically dissolve, or that its nullification must have been demanded in order to effect dissolution of the rights acquired by the grantees, or, for that matter, that plaintiffs could not demand dissolution of those rights as they affect their property. Therefore, in my view, because the rights of the grantees of the rights of way were extinguished by failure to meet the conditions of the contract creating those rights, it is unnecessary to consider the other issues decided by the majority.
Only the rights of Louisiana Southern Railway Company and Hodges Stock Yards, Inc., are in question here, no application having been filed seeking review of the Court of Appeal judgment declaring the rights of New Orleans Terminal Company to be extinguished.
By the March 12, 1891 agreement Crescent City Live Stock Landing and Slaughter House Company granted a "right of way over and across the land of said Company" to the New Orleans and Gulf Railroad, which, in turn, assigned to Louisiana Southern Railways Company the rights it now asserts.
The documents granting the rights of way in question specifically provided that *1374 the rights of way were to continue so long as the property of the grantors continued to be used as cattle yards and/or slaughter houses and attendant factories, and no longer.
The consideration supporting the agreement of March 12, 1891 was stipulated to be "the advantages and conveniences accruing to the shippers of cattle, and in consideration of the improvement and increased facilities thus offered to those engaged in the cattle trade."
The term or duration of the right of way was set forth as follows:
". . . [A]nd this grant of way shall be exclusively used for operating cattle-cars and such other rolling stock as may be required for the purposes of cattle yards and slaughter houses and attendant factories, and shall continue in full force as long as the said property of the said Crescent City Live Stock Landing & Slaughter House Company shall be used for the business for which it is now used or any other of like nature and no longer." (emphasis added).
The business of Crescent City Live Stock Landing and Slaughter House Company is exemplified by its name. The demise of that particular mode of business appears from the testimony at the trial. A former salesman and operator of auction sales for New Orleans Stock Yards, Inc., later named Hodges Stock Yards, Inc., successor to parts of the property formerly owned by Crescent City Live Stock Landing and Slaughter House Company, testified that Arabi Packing Company acquired part of the business of Crescent City Stock Yards and Slaughter House Company, and New Orleans Stock Yards, Inc., acquired another part of that business. He said Arabi Packing Company had holding pens, a slaughter house, coolers and trucks to deliver the meat it refrigerated. New Orleans Stock Yards, Inc., provided stock yard facilities to commission merchants, and a per head yardage fee was charged. According to this witness, who was 61 years old at the time of the trial and a lifelong resident of the neighborhood, in March of 1964 he made a public statement on behalf of Hodges Stock Yards, Inc., that livestock auctions of cattle were discontinued.
An official of that company conceded that Hodges Stock Yards, Inc., no longer "handle or slaughter live cattle." He testified that "[t]he Hodges Stock Yards property is being used for warehouses, cold storage facilities, and that's principally dry and cold storage facilities." The rails service on the rights of way, he said, were needed to service his tenants, whom he listed as Modern Woodcrafts, Ace Box Company, and Mr. Doescher, none of whom were shown to be using their property for cattle yards or slaughter houses. Hodges had agreements with meat handlers who were using his cold storage facilities, but they used trucks, not rail service. Hodges objected to removal of the tracks because
"We also hope and feel that the biggest and best use of our property is the port development in St. Bernard, and we want to use these tracks. Saint Bernard has had trouble establishing its rights to use the property. The port authority in New Orleans has controlled the riverfront. This has been a problem in the development of the port facility down here. We feel that some day along the line we'll get the port working and established, and we need the tracks to service the port industry that will come."
An official of Louisiana Southern Railway Company testified that the very last time that any "livestock" was shipped over the tracks of New Orleans Terminal Company was in 1966 when three cars of sheep were brought in, fed, watered, and shipped out. They were not slaughtered. The tracks of Louisiana Southern Railway Company, he said, have not, to his knowledge, been used for livestock since 1960.
The contract here is one which may be denominated as a contractual grant of enjoyment of certain rights of the owner upon his land. As such, great latitude is granted to the owner of property to stipulate the terms and conditions by which the grantee may enjoy the rights thereby conferred. Just as the manner of enjoyment may be *1375 limited, the duration of the right may also be limited. It is the intention of the parties as expressed in the contract which governs. La.Civil Code arts. 2013, 2015.
From the record evidence the conclusion is inescapable that the property of Hodges Stock Yards, Inc., is not being used "for the purposes of cattle yards and slaughter houses" nor are the rights of way used for those purposes, as the grant requires. These properties were not being used for those purposes when this suit was filed in 1971.
Thus the conditions attached to the right of way agreement, upon which the life of that contract depends, are no longer being performed. Because these resolutory conditions are not being met the contract is annulled by its terms, and the rights of the parties which are dependent upon the fulfillment of those conditions are defeated. La.Civil Code arts. 2021, 2028.
I find no conflict between the quoted provision, which I feel brings about a dissolution or extinguishment of the rights of way under these circumstances, and the clause which states "the said Slaughter House Company reserving to itself the right to cancel and annul the right of way herein granted, whenever it shall select itself or be compelled to change the nature of the business." This latter termination clause is another method by which the contract may be dissolved. The first is automatic and brings about the annulment and cancellation of the right of way upon the failure to maintain certain conditions. The second requires affirmative action on the part of the grantor to cancel and annul the right of way when "compelled" to change the nature of the business, which is to operate cattle yards and slaughter houses; or when it "desires to make a conveyance" of the property. The stipulations are not incompatible or inconsistent. Each is operative independently of the other, and I find no objection to the recognition of the first provision independently of the second. To hold otherwise is to rewrite the contract which is the law between the parties.
I respectfully dissent.

ON REHEARING APPLICATIONS
PER CURIAM.
Applications for rehearing in this case have been filed by plaintiffs-respondents Farrell, et al. and defendant-relator Hodges Stock Yards, Inc. We find no merit in the application of plaintiff Farrell.
The application of defendant Hodges suggests a possible ambiguity in the opinion at footnote two. Hodges points out that while the Court of Appeal opinion is indeed final as it relates to defendant New Orleans Terminal Company, a party which did not seek writs of this Court following an unfavorable decision in the Court of Appeal, it (the applicant) nonetheless retains rights as to that servitude (hereinafter referred to as the second servitude) which New Orleans Terminal Company was initially granted in 1908 by Hodges' predecessor in title.
Hodges' contention prompts us to issue this per curiam. Insofar as Hodges is concerned, the issue as to the continued existence of the second servitude was perpetuated by Hodges' application for and procurement of a writ of review. Furthermore, our original opinion confirmed the validity of Hodges' interest[1] in both of the servitudes in question.
The pertinent language in the 1908 agreement by which Hodges' predecessor in title granted the servitude to New Orleans Terminal Company is identical to the language in the 1891 servitude agreement which we examined in the original opinion. Our holdings there, that the language does not provide for an automatic dissolution of the servitude and that the railroad servitude is indivisible, apply here for the same reasons. Likewise, our holding that the 1921 sale to Arabi Packing Company created a predial servitude upon the vendor's *1376 (and vendee's) property applies equally in this instance.
The pending applications for rehearing on behalf of plaintiff Farrell and defendant Hodges are hereby denied, with the reservation to plaintiff Farrell of the right to apply for rehearing anew only on the issue discussed in this per curiam.
SUMMERS and MARCUS, JJ., dissent from the refusal to grant the application for rehearing of Thomas C. Farrell, Jr., et al., and, also, dissent from this per curiam.
NOTES
[1] Plaintiffs had made an earlier effort to remove and/or relocate the same tracks before the Louisiana Public Service Commission. Their application was denied, and that decision was upheld in the Nineteenth Judicial District Court for the Parish of East Baton Rouge and in this Court. Denegre v. Louisiana Public Service Commission, 257 La. 503, 242 So.2d 832 (1970).
[2] The third defendant, New Orleans Terminal Company, did not seek writs in this Court. Therefore, the judgment below is final as to that defendant, and our discussion will not deal with the demands of plaintiffs which related exclusively to that defendant, nor to the 1908 agreement by which its predecessor corporation acquired its right of way. It should be pointed out, however, that the two railroad defendants, Louisiana Southern Railway Company and New Orleans Terminal Company, had acquired two separate servitudes, with Louisiana Southern by independent agreement allowing New Orleans Terminal Company to use a portion of its tracks and right of way. Although both companies are now members of the Southern Railway System, they have always been separate corporations and their servitude grants are separate and distinct.
[3] Moreover, we note that the grantor's right to elect whether or not it will terminate the servitude is emphasized a second time in the same instrument, concededly in relation to certain acts or omissions on the part of the railroad, in these words:

It is agreed that any violation of the foregoing contract shall be reported to the railroad Company or its General Manager and if after fifteen days' notice the Railroad Company failed to comply with the terms of this contract, then the said Crescent City Slaughter House Company shall be entitled to annul and cancel the said contract, without the necessity of placing the said Railroad Company in default . . .."
[4] A slaughter house operated on a portion of the property closed in 1963. There is, however, at least one meat packing plant still on the property, and defendants contend that such business is closely related to the slaughter house business, such that the property is still being used for a business of "like nature." We assume for purposes of this opinion that the meat packing plant does not constitute a business of "like nature" to a slaughter house.
[5] George Denegre acted as agent for the purchasers Joseph Merrick Jones and Thomas E. Farrell. Although only Denegre's name is on the act of sale, the actual purchasers were Jones and Farrell.
[6] We note the recently-amended personal servitude section of the Civil Code which includes a new category for servitudes such as this one which is denominated a "personal servitude of right of use." Rev.C.C. arts. 639-45. Revised Article 645, which follows, confirms our holding herein:

"A right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude. (Revised by Acts 1976, No. 103, § 1.)"
[7] We note in passing that our holding here, that a limited personal servitude running in favor of a railroad is indivisible in nature, coincides in part with the position of the concurring judge on the court of appeal. He took the position that because of that indivisibility the entire servitude was extinguished when the servitude automatically dissolved. Our finding it indivisible, after concluding the servitude was not automatically dissolved, serves to prevent plaintiffs from nullifying any part of the servitude.
[1] It should be noted that it is not merely Hodges' interest in the tracks which is at stake in the litigation, but the interest of Hodges' grantees and tenants who use and wish to continue using the railroad tracks.