379 So.2d 838 (1980)
BOARD OF COMMISSIONERS OF the PORT OF NEW ORLEANS
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY.
No. 10638.
Court of Appeal of Louisiana, Fourth Circuit.
January 10, 1980.
Writ Refused February 22, 1980.
*839 Phelps, Dunbar, Marks, Claverie & Sims, Eugene R. Preaus, Danny G. Shaw, New Orleans, for plaintiff-appellee.
Dillon & Cambre, Gerard M. Dillon, New Orleans, for defendant-appellant.
Before SAMUEL, LEMMON and GULOTTA, JJ.
GULOTTA, Judge.
The Illinois Central Gulf Railroad Company (the Railroad) appeals from a judgment awarding to the Board of Commissioners of the Port of New Orleans (the Dock Board) $12,509.71 for the cost of replacing the Dock Board's sewer line which runs alongside defendant's railroad track. The sewer line was damaged when the Railroad raised the grade level of the track on a site subject to a servitude in favor of the Railroad. We affirm.
In 1972 the Railroad and the Dock Board confected an agreement in which the Railroad, in consideration of the Dock Board's granting it the exclusive right to perform switching services to the dock, agreed to provide and maintain all trackage necessary for this service. Pursuant to that agreement, in 1973 the Dock Board granted a servitude to the Railroad for the construction, reconstruction, operation, inspection, and maintenance of railroad tracks in the *840 vicinity of the Milan Street Wharf. The Dock Board also agreed not to place, or to permit others to place, any structures or obstructions closer than eight and one-half feet from the center line of each track or twenty-two feet above each track, without the written consent of the Railroad. At some time subsequent to the granting of the servitude, however, the Dock Board installed a plastic sewer line approximately one foot beneath the surface of the asphalt covering the area, running approximately twelve to eighteen inches from the end of the cross-ties, adjacent to and outside the track.
In response to the Dock Board's request, in May 1977, the Railroad agreed to regrade the level of the track at the Milan Street Wharf. In June 1977, the Dock Board removed approximately fifteen hundred feet of surface asphalt prior to commencement of the Railroad's portion of the work. Removal of the asphalt left about fifty feet of the sub-surface sewer line exposed intermittently along a one hundred fifty foot section parallel to the railroad tracks. Although each party claims the other caused the breaks in the pipe, it is clear that the damage to the line was caused by the Railroad. In regrading the track, the Railroad used an electromatic tamping machine. The electromatic tamper stands on outriggers which extend outside and along the track and press down when the track is lifted by the machine. Each outrigger has a foot approximately three to four inches wide and two to three inches long. In this case, the outrigger feet rested on top of the sewer line and, when the machine pressed down while operating, the feet punctured the plastic pipe in numerous places.
Several Dock Board employees, present during this operation, testified they called the attention of the Railroad crew foreman to the damage being done to the pipe. The Railroad crew nonetheless continued to break the pipe. The crew foreman admitted that he could see the exposed sewer line in places, and admitted he was aware that when the tamping machine operated, the foot rested on the plastic pipe. He and other members of the Railroad crew testified they attempted to bridge the pipe with timbers to avoid breaking it; when the attempts were unsuccessful, however, they continued work despite the damage being done to the pipe.
The Railroad division engineer admitted that the Railroad had been furnished in advance with drawings showing the eight-inch sewer line in close proximity to the railroad track. He acknowledged that the track could have been elevated by using an alternate method, old-fashioned hand jacks, to avoid damage to the sewer line. The record is vague as to the comparative cost of using the tamping machine versus the hand jacks; it appears, nonetheless, that the approximate costs were not substantially different. Certainly, as far as we can infer from the indeterminate evidence on this point, performing the operation by hand would have cost perhaps $180.00 more than using the machine, as opposed to an ultimate cost in excess of $12,000.00 to replace the damaged pipe.
It is undisputed on appeal that the sewer line was located within eight and one-half feet of the center line of the track. The Railroad contends the Dock Board violated the servitude's restrictions by locating the sewer line within the boundary of the servitude. The Railroad argues this was a material obstruction placed on the servitude tract by the owner of the servient estate that impedes exercise of the servitude, and therefore that the Railroad, as owner of the servitude, is under no duty to avoid injuring the obstructing property. The Dock Board, on the other hand, asserts that if an encroachment existed it was not a "material" obstruction "wholly incompatible" with the servitude. Alternatively, the Dock Board contends that if the encroachment was material and wholly incompatible, the Railroad is nonetheless responsible for the cost of replacement because it wantonly and willfully destroyed the pipe, when a reasonable alternate method for performing the maintenance was available.
In his oral reasons for judgment, the trial judge concluded that, despite admonitions *841 by Dock Board representatives regarding destruction to the pipe, the Railroad crew deliberately continued with the work resulting in breakage of the sewer pipe. The judge specifically rejected testimony of railroad employees who stated that the pipe breakage occurred when the Dock Board removed the asphalt. He found that the Railroad employees had knowledge of the existence of damage "at the time that the work was being done."
It is clear that the location of the sewer line constituted a material obstruction and was wholly incompatible with the maintenance duties of the Railroad under the servitude agreement. Nevertheless, the Railroad cannot be exonerated from responsibility for damage its crew caused to the sewer line, because they were aware and acknowledged that the continued operation of the tamping machine was causing extensive damage to the line.
Although a servitude in favor of a public railroad is a limited personal servitude rather than a predial servitude, it is regulated by the rules governing usufruct and predial servitudes, applied by analogy. LSA-C.C. article 645; Farrell v. Hodges Stock Yards, Inc., 343 So.2d 1364 (La.1977).
Civil Code article 748 (formerly article 777) states, in pertinent part, that the owner of a servient estate may do nothing tending to diminish or make inconvenient the use of the servitude. However, Civil Code article 745 (formerly article 774) provides,
"The owner of the dominant estate has the right to enter with his workmen and equipment into the part of the servient estate that is needed for the construction or repair of works required for the use and preservation of the servitude. He may deposit materials to be used for the works and the debris that may result, under the obligation of causing the least possible damage and of removing them as soon as possible."
While the Dock Board made use of the servitude inconvenient and interfered with the Railroad's maintenance responsibility, the Railroad violated its duty to cause the least possible damage to the servient estate. An alternate method of elevating and grading the tracks could have been used at a comparatively minimal expense to the Railroad.
When we compare the extent of monetary damage of the Dock Board's pipe to the additional expense for the Railroad to use an alternate method which would have prevented damage to the pipe, we conclude the trial judge properly rendered judgment in the Dock Board's favor. The following language from Duet v. Louisiana Power and Light Company, 169 F.Supp. 184 (E.D.La.1958), best describes the basis of the trial court's conclusion in this case. In Duet, the U. S. District Court stated:
"It is settled in Louisiana, as elsewhere, that one having an easement or servitude on another's land is bound to use that easement or servitude in such manner as not unreasonably to injure the right of the owner of the servient estate, and that if the owner of the easement or servitude uses it in a negligent, unauthorized or unreasonable manner, the owner of the servient estate may maintain an action for damages resulting from such use ... The obligation of the owner of the servitude is not to cause no damage, but to cause `the least possible damage'." 169 F.Supp. at 186.
We conclude the record supports the factual conclusions of the trial judge. We find further that the Railroad, as owner of the servitude, violated its obligation to cause the least possible damage to the servient estate. Accordingly, we affirm the judgment of the district court.
AFFIRMED.