# Supreme Court of Louisiana

The Opinions handed down on the **30th day of June, 2015**, are as follows:

**BY HUGHES, J.**:

2014-CQ-1598    R.T. FAULK, III, COREY FARMS, L.L.C.; FAULK FARMS, INCORPORATED; JOANNE HODGES; RIVER VALLEY PROPERTIES; MCHENRY FARMS, L.L.C.; SHERMAN SHAW; T.P. GODWIN; WILLIAM G. NADLER; MCHENRY REALTY PARTNERSHIP v. UNION PACIFIC RAILROAD COMPANY

We have answered the certified question as set forth in this opinion.  Pursuant to Rule XII, Supreme Court of Louisiana, the judgment rendered by this court upon the question certified shall be sent by the clerk of this court under its seal to the United States Court of Appeals for the Fifth Circuit and to the parties. CERTIFIED QUESTION ANSWERED.

WEIMER, J., concurs and assigns reasons.

SUPREME COURT OF LOUISIANA

NO. 2014-CQ-1598

R.T. FAULK, III; COREY FARMS, L.L.C.; FAULK FARMS, INCORPORATED; JOANNE HODGES; RIVER VALLEY PROPERTIES; MCHENRY FARMS, L.L.C.; SHERMAN SHAW; T.P. GODWIN; WILLIAM G. NADLER; MCHENRY REALTY PARTNERSHIP

VERSUS

UNION PACIFIC RAILROAD COMPANY

ON CERTIFIED QUESTION FROM THE UNITED STATES
FIFTH CIRCUIT COURT OF APPEALS

**HUGHES, J.**

We accepted the certified question presented to this court by the United States Court of Appeals, Fifth Circuit, in **Faulk v. Union Pacific Railroad Company**, 576 Fed.Appx. 345 (5th Cir. 2014) (per curiam).[1]  The question posed by the Fifth Circuit is:  "Whether the application of LA. REV. STAT. § 48:394 to any of the properties in this case amounts to an unconstitutional taking of private property without a public purpose, in violation of Article I, Section 4 of the Louisiana Constitution."[2]   See 576 Fed.Appx. at 350-51.  For the reasons that follow, we conclude that LSA-R.S. 48:394 has not effected an unconstitutional taking of private property as applied to the facts established in this case.

---

[1] See **Faulk v. Union Pacific Railroad Company**, 14-1598 (La. 10/31/14), 151 So.3d 611.

[2] The Fifth Circuit further stated:

> To the extent the [Louisiana Supreme] Court deems appropriate, we include within this question the related issue of to what extent a railroad enjoys exclusive rights in any of the existing crossings, particularly against the servient estate.  We disclaim any intent to limit the [Louisiana Supreme] Court to the precise question asked.

See **Faulk v. Union Pacific Railroad Company**, 576 Fed.Appx. at 351.

# FACTS AND PROCEDURAL HISTORY

The salient facts of this case are not in dispute. The predecessor(s) of the defendant, Union Pacific Railroad Company ("Union Pacific"), acquired the right to build a railroad over the property at issue in this case, located in Ouachita Parish, Louisiana, in the late 1880s. The railroad company provided not only public crossings over its tracks but also private crossings for the convenience of landowners, whose large tracts of land were divided by the railroad tracks.

Sometime in 2006, Union Pacific began posting written notices at selected private railroad crossings, indicating its intent to close those crossings. On January 22, 2007 the plaintiffs, who allege their farming operations would be disrupted by the closure of the private crossings, on which they relied to move farming equipment and materials from one section of farmland to another separated by the railroad tracks, filed suit in the Fourth Judicial District Court in Ouachita Parish,[3]

---

[3] On this issue, the plaintiffs specifically allege the following pertinent allegations in their petition:

11.
In order to conduct farming operations on both sides of the railroad, Plaintiffs must be able to pass across the right of way with farm equipment, materials, and the like. Since the time when these rights of way were granted, they or their predecessors have in fact continuously farmed on both sides of the railroad and have in fact passed across the right of way with men, materials, and equipment.

12.
To enable that passage, there have at all pertinent times been crossings over the railroad, in the form of roads, most of which have been private, not public, roads. These were historically constructed and maintained by the railroad.

13.
These private crossing points are critical to practical farming operations; and, as to some of the lands, they constitute the only means of access to the farmland on the other side of the tracks without passing over the land of other owners.

14.
There are few public roads in the area which cross the track, and those are miles apart. Without the private roads and crossings, in order to cross the tracks with farm equipment and harvested crops, Plaintiffs will be forced to drive heavy farm machinery for miles, and to use roadways in many instances which are not practically usable by such heavy loads in bad weather.

15.
The effect will be to seriously impair the utility and value of the land and impair the ability of Plaintiffs to practically and profitably carry out farming operation on it. It will also create danger to the public by forcing Plaintiffs to regularly operate slow and wide farm equipment on a four-lane U.S. Highway and other public roads.

seeking declaratory and injunctive relief to prevent Union Pacific from closing approximately ten private crossings and to require that Union Pacific reopen the private crossings it had already closed.[4]

In March 2007 Union Pacific removed the suit to the United States District Court for the Western District of Louisiana, based on diversity jurisdiction, and filed a counterclaim seeking declaratory and injunctive relief to permit it to close the private crossings and to prevent the plaintiffs from interfering in either the creation or closure of crossings.

Shortly after the filing of this litigation, the Louisiana Legislature passed 2008 La. Acts, No. 530, effective August 15, 2008,[5] enacting LSA-R.S. 48:394, which requires the submission of an advance written notice, by registered or certified mail, to the Louisiana Public Service Commission ("LPSC") and to the "owner or owners of record of the private crossing traversed by the rail line" by a railroad company desiring to close or remove a private crossing. After publication of notice and a public hearing, during which interested parties have had an opportunity to be heard, the LPSC is directed by the statute to determine whether each private railroad crossing at issue unreasonably burdens or substantially

---

[4] We note that the plaintiffs also allege that the defendant has failed to maintain and preserve the natural drainage of water across the servitude, despite notice and demand from the plaintiffs.

[5] Act 530 was amended by 2010 La. Acts, No. 858, effective June 30, 2010. The 2010 amendment made three changes to the statute: (1) the last sentence of Paragraph (A)(1), which had previously read: "the reason the railroad company proposes to close such crossing," was changed to read: "the manner in which such private railroad crossing unreasonably burdens or substantially interferes with rail transportation"; (2) the clause in Paragraph (C), which had previously read: "closure or removal of such private crossing is necessary for safety and in the best interest of the public" was changed to read: "the private railroad crossing unreasonably burdens or substantially interferes with rail transportation"; and (3) Paragraph (D) was added, to read: "The provisions of this Section shall not apply when a private landowner or landowners and a railroad company enter into a consensual or negotiated written agreement or agreements to close a private railroad crossing." As recognized by the Fifth Circuit in its certification to this court, the 2010 amendments to Paragraphs (A) and (C) of LSA-R.S. 48:394 were prompted by **Franks Investment Company v. Union Pacific Railroad Co.**, 593 F.3d 404, 414 (5th Cir. 2010) (en banc), which held that federal law preempts state regulation of private crossings that "unreasonably burden[s] or interfere[s] with rail transportation." See **Faulk v. Union Pacific Railroad Co.**, 576 Fed.Appx. at 346-47. The Fifth Circuit stated that, in doing so, the Act attempts to balance the rights of the railroad company and the owners of private crossings by ensuring that the railroad companies do not unilaterally close private crossings unless doing so is necessary for the railroads to continue operating free from substantial burdens. See **id.** at 347.

interferes with rail transportation.[6]

On the filing of motions for summary judgment by the parties, the federal court in the instant case granted a partial summary judgment to Union Pacific on the "lessee" plaintiffs' claims,[7] with regard to the private crossings closed prior to the effective date of LSA-R.S. 48:394.[8] Union Pacific's motion for summary judgment, as it applied to the plaintiffs' claims regarding the closure of any private crossings in existence on or after the effective date of LSA-R.S. 48:394, was denied; the federal district court concluded that, subsequent to the enactment of LSA-R.S. 48:394, Union Pacific had no right to close any private crossings without first applying to the LPSC. The federal district court further concluded that the plaintiffs were entitled to summary judgment, in part, on certain of their requests for declaratory and injunctive relief, ruling that: Union Pacific has only "rights of way" through the plaintiffs' land; any crossings closed on or after the effective date

---

[6] In a separate suit, Union Pacific immediately challenged the validity of this statute, seeking to have LSA-R.S. 48:394 and LPSC General Order No. R-30712 (issued in implementation of the statute) declared facially preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA"), 49 U.S.C. § 10501, as administered by the U.S. Surface Transportation Board ("STB"), and requesting that enforcement be enjoined. Recognizing that state police powers have historically extended to railroad crossing disputes, the federal district court held that, although "the Act and Order impose a preclearance requirement on railroad carriers before a private rail crossing may be closed," "this regulation does not have the effect of managing or governing the operations of rail transportation and is not expressly preempted under the ICCTA." See **Union Pacific Railroad Company v. Louisiana Public Service Commission**, 722 F.Supp.2d 699 (M.D. La. 2010) ("The typical disputes regarding rail crossings are simply not in the nature of regulation governed by the exclusive jurisdiction of the STB, 'despite the fact that they touch the tracks in some literal sense,' . . . and thus do not fall into the category of state actions that are 'categorically' or 'facially' preempted under the ICCTA."); **New Orleans & Gulf Coast Railway Company v. Barrois**, 533 F.3d 321, 337-38 (5th Cir. 2008) ("The Federal Railroad Administration . . . has acknowledged that private crossings are governed by - if anything - state law, and not federal, law."); **Home of Economy v. Burlington Northern Santa Fe Railroad**, 694 N.W.2d 840, 846-47 (N.D. 2005).

[7] The plaintiffs who asserted claims as lessees of property served by the private railroad crossings were found to have been: Corey Farms, LLC, Faulk Farms, Inc., Sherman Shaw, Mrs. T.P. Godwin, and William P. Nadler. See **Faulk v. Union Pacific Railroad Company**, 2010WL3325704 at p. 5 n.3 (W.D. La. 2010) (unpublished).

[8] Although the federal district court originally stated that date was June 30, 2008, the effective date of LSA-R.S. 48:394 was later clarified as having been August 15, 2008. See **Faulk v. Union Pacific Railroad Company**, 2011WL777905, p. 5 n.3 (W.D. La. 2011) (unpublished) ("As noted above, the effective date of Act No. 530, which created La.Rev.Stat. 48:394, was August 15, 2008, not June 30, 2008, the date of its enactment. However, the record indicates that no crossings were closed after this lawsuit was filed on January 22, 2007; therefore, the effective date does not change the Court's analysis or disposition of the claims in this matter.").

of LSA-R.S. 48:394 were improperly closed because Union Pacific failed to comply with LSA-R.S. 48:394; Union Pacific should be permanently enjoined from closing any existing crossings without complying with LSA-R.S. 48:394; and conditional injunctive relief for private crossings closed on or after the effective date of LSA-R.S. 48:394 should be rendered. However, Union Pacific's requests for declaratory relief with respect to private crossings closed prior to the effective date of LSA-R.S. 48:394 were reserved for trial. See **Faulk v. Union Pacific Railroad Company**, 2010WL3325704 (W.D. La. 2010) (unpublished); **Faulk v. Union Pacific Railroad Company**, 2011WL777905 (W.D. La. 2011) (unpublished). The federal district court further ruled that Union Pacific failed to demonstrate that LSA-R.S. 48:394 is unconstitutional. See **Faulk v. Union Pacific Railroad Company**, 2011WL777905.

On review, the Fifth Circuit held that the district court had improperly reached the issue of whether LSA-R.S. 48:394 results in an unconstitutional taking, citing the basic jurisprudential tenet that courts should avoid reaching constitutional questions unnecessarily and pointing out that Union Pacific had not established whether it had ownership rights over the property at issue. The Fifth Circuit vacated the district court ruling as to Union Pacific's "as-applied challenge"[9] and remanded for the district court to more fully develop the record regarding the property interests at issue. See **Faulk v. Union Pacific Railroad Company**, 449 Fed.Appx. 357 (5th Cir. 2011).

On remand to the federal district court, the plaintiffs conceded that Union Pacific has an interest in the nature of a real right under Louisiana law and that the interest was sufficient to permit it to properly assert the question of the validity of

---

[9] The Fifth Circuit expressly stated, "In this action, Union Pacific brings an as-applied challenge to Section 48:394." See **Faulk v. Union Pacific Railroad Company**, 449 Fed.Appx. at 364. Union Pacific also states, in brief to this court: "This case does not involve . . . a facial attack by Union Pacific on the validity of the Act."

the statute in question; although, the parties disputed the precise nature of the interest, with the plaintiffs contending the railroad's interest was a servitude of passage, while Union Pacific asserted "fee title" to the land beneath its railroad. The federal district court concluded that the railroad has only a servitude over the plaintiffs' lands, after considering the language of the pertinent deeds and the fact that the plaintiffs and/or their ancestors-in-title had paid ad valorem taxes on these properties through the years. See **Faulk v. Union Pacific Railroad Company**, 2013WL1193069 (W.D. La. 2013) (unpublished).

Thereafter, the federal district court certified to the Fifth Circuit two questions: "(1) 'If Union Pacific does not have ownership rights to the private railroad crossings, does it have standing to challenge Louisiana Revised Statute 48:394 ("the Act")? (2) If so, is the Act constitutional under the United States and Louisiana Constitutions?'" See **Faulk v. Union Pacific Railroad Company**, 576 Fed.Appx. at 348 (footnote omitted).

Though noting that the parties failed to brief the standing question, the Fifth circuit addressed the issue, "due to its jurisdictional dimensions," and concluded that Union Pacific's possession of a servitude constitutes a sufficient right to confer standing in this case. See **Faulk v. Union Pacific Railroad Company**, 576 Fed.Appx. at 348 n.2 (citing **Polk v. Ball**, 149 F.2d 263 (5th Cir. 1945); **Parkway Development Corporation v. City of Shreveport**, 342 So.2d 151, 153-54 (La. 1977)). In so holding, the Fifth Circuit expressly affirmed the district court's conclusion that "Union Pacific's rights are those of a servitude, not a fee simple." See **Faulk v. Union Pacific Railroad Company**, 576 Fed.Appx. at 349.

Having resolved the first issue, the Fifth Circuit certified the remaining question to this court, as to whether LSA-R.S. 48:394 violates the Louisiana Constitution's prohibition on takings, noting that Union Pacific had waived federal constitutional questions previously raised. See **Faulk v. Union Pacific Railroad**

6

**Company**, 576 Fed.Appx. at 348 n.3 ("Union Pacific has briefed only the Louisiana constitutional question. We thus deem the question under the federal constitution waived."). The certified question was accepted by this court. See **Faulk v. Union Pacific Railroad Company**, 14-1598 (La. 10/31/14), 151 So.3d 611.

## LAW AND ANALYSIS

As a general rule, statutes are presumed to be constitutional, and, the party challenging the validity of a statute has the burden of proving its unconstitutionality. **Louisiana Federation of Teachers v. State**, 13-0120 (La. 5/7/13), 118 So.3d 1033, 1048; **M.J. Farms, Ltd. v. Exxon Mobil Corporation**, 07-2371 (La. 7/1/08), 998 So.2d 16, 31; **City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund**, 05-2548 (La. 10/1/07), 986 So.2d 1, 12.

Unlike the federal constitution, the Louisiana Constitution's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of the state exercised through its legislature. Therefore, the legislature may enact any legislation that the state constitution does not prohibit. **Louisiana Municipal Association v. State**, 04-0227 (La. 1/19/05), 893 So.2d 809, 842-43.

Consequently, a party challenging the constitutionality of a statute must point to a particular provision of the constitution that would prohibit the enactment of the statute and must demonstrate clearly and convincingly that it was the constitutional aim of that provision to deny the legislature the power to enact the legislative instrument in question. **Louisiana Federation of Teachers v. State**, 118 So.3d at 1048; **M.J. Farms, Ltd. v. Exxon Mobil Corporation**, 998 So.2d at 31; **City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund**, 986 So.2d at 12. A constitutional limitation on legislative power may be either express or implied. **Id.**

Because it is presumed that the Louisiana Legislature acts within its

7

constitutional authority in promulgating a statute, this court must construe a statute so as to preserve its constitutionality when it is reasonable to do so. In other words, if a statute is susceptible of two constructions, one of which would render it unconstitutional or raise grave constitutional questions, the court will adopt the interpretation of the statute, which, without doing violence to its language, will maintain its constitutionality. See **Louisiana Federation of Teachers v. State**, 118 So.3d at 1048; **M.J. Farms, Ltd. v. Exxon Mobil Corporation**, 998 So.2d at 31-32; **City of New Orleans v. Louisiana Assessors' Retirement and Relief Fund**, 986 So.2d at 12-13.

The Louisiana Constitution is the supreme law of this state to which all legislative acts must yield. When a statute conflicts with a constitutional provision, the statute must fall. **Id.**

In the instant case, Union Pacific contends that since LSA-R.S. 48:394 prevents closure or removal of private crossings without prior approval by the LPSC, it violates the prohibition on takings set forth in LSA-Const. Art. I, § 4.[10] Pursuant to Article I, Section 4(B), property shall not be taken or damaged by the

_____

[10] Article I, Section 4, provides, in pertinent part:

> (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
> (B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
> * * *
> (4) Property shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is public and necessary shall be a judicial question.
> (5) In every expropriation or action to take property pursuant to the provisions of this Section, a party has the right to trial by jury to determine whether the compensation is just, and the owner shall be compensated to the full extent of his loss. Except as otherwise provided in this Constitution, the full extent of loss shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred by the owner because of the expropriation.
> * * *

8

state or its political subdivisions except for public purposes and with just compensation paid to the owner or into the court for his benefit. **Suire v. Lafayette City-Parish Consolidate Government**, 04-1459 (La. 4/12/05), 907 So.2d 37, 60.

When there has been a taking, the Louisiana Constitution requires compensation even though the state has not initiated expropriation proceedings in accordance with the statutory scheme set up for that purpose. This "inverse condemnation" action provides a procedural remedy to a "property" owner[11] seeking compensation for land already taken or damaged against a governmental or private entity having the powers of eminent domain where no expropriation has commenced. See **Avenal v. State**, 03-3521 (La. 10/19/04), 886 So.2d 1085, 1103-04, cert. denied, 544 U.S. 1049, 125 S.Ct. 2305, 161 L.Ed.2d 1090 (2005) (citing **State, Department of Transportation and Development v. Chambers Investment Company**, 595 So.2d 598, 602 (La. 1992)).[12]

Inverse condemnation claims derive from the Taking Clauses contained in both the Fifth Amendment of the U.S. Constitution and Article I, Section 4 of the Louisiana Constitution. Under the Louisiana Constitution, the action for inverse

---

[11] All real rights, such as ownership, personal servitudes, predial servitudes, and mineral servitudes, are "property" in the narrow sense. A.N. Yiannopoulos, 2 **La. Civ. L. Treatise**, Property § 3 (4th ed. 2014). See also **Avenal v. State**, 03-3521 (La. 10/19/04), 886 So.2d 1085, 1105-06 (citing **State Department of Transportation and Development v. Jacob**, 483 So.2d 592, 594-95 (La. 1986) ("The clear intent of the framers of [LSA-Const. Art. I, § 4] was to expand the right to compensation to include not only the property owners, but also of other persons who have legal status to require compensation such as lessees."); **Columbia Gulf Transmission Company v. Hoyt**, 252 La. 921, 936-37, 215 So.2d 114, 120-21 (La. 1968) (holding that a predial lease (even though classified as a personal right, as distinguished from a real right) is property within the meaning of the Louisiana Constitution, and, as such, it must be accorded constitutional protection, requiring just compensation to the lessee when the lease rights are damaged; and further recognizing that "property is 'taken' when the public authority acquires the right of ownership or one of its recognized dismemberments").

[12] See also LSA-R.S. 19:1 et seq. (relative to expropriation proceedings in general); LSA-R.S. 45:353 (enacted by 1902 La. Acts, No. 73, § 1) ("Foreign railway companies extending, constructing and operating their lines of railroad into and through Louisiana may expropriate land and other property for their railroad, right of way, switches, sidings, branches, spurs, depots, and depot grounds, yards, and any land and property for railroad purposes, in the manner provided by the expropriation laws of the state.").

condemnation is available in all cases where there has been a taking *or damaging* of property[13] when just compensation has not been paid, without regard to whether the property is corporeal or incorporeal. See **id.** The constitutional command of Article I, Section 4, is self-executing, such that the cause of action arises whenever a state commits a taking without justly compensating the victim. **Avenal v. State**, 886 So.2d at 1104.

Recognizing the abstract nature of the concept of the taking and damaging of legal property rights, this court in **State, Department of Transportation and Development v. Chambers Investment Company**, 595 So.2d at 603, set forth a three-prong analysis for determining whether a claimant is entitled to eminent domain compensation; the court must: (1) determine if a recognized species of property right has been affected; (2) if it is determined that property is involved, decide whether the property has been taken or damaged in a constitutional sense; and (3) determine whether the taking or damaging is for a public purpose under Article I, Section 4. See **Avenal v. State**, 886 So.2d at 1104. We will examine each of these three elements in turn.

Whether a Recognized Species of Property Right has been Affected

We first note that, although the common law concept of a "fee simple" title (a term used by the parties in this case) to immovable property is analogous to Louisiana's concept of the "ownership" of immovable property and the term "fee simple" has at times crept into Louisiana jurisprudence and statutory law, it should be pointed out that, under Louisiana's Civil Code, "[t]he predominant property right is *ownership*, which is a complete, free, and exclusive right." See A. N.

---

[13] Under the U.S. Constitution's Taking Clause, in order for a taking to be compensable, it must constitute an actual, permanent invasion of the property, amounting to an appropriation of, and not merely an injury to, the property (see **Loretto v. Teleprompter Manhattan CATV Corp.**, 458 U.S. 419, 428, 102 S.Ct. 3164, 3172 (1982)), while the Louisiana Constitution's Taking Clause expressly requires the payment of just compensation when private property has been "taken *or damaged* . . . and the owner shall be compensated to the full extent of his loss." See LSA-Const. Art. I, § 4(B)(1) and (B)(5) (emphasis added); **Avenal v. State**, 886 So.2d at 1103-04. We note that Union Pacific has urged only a "taking" in this case.

Yiannopoulos, 2 **La. Civ. L. Treatise**, Property § 9 (4th ed. 2014) (emphasis added).

Louisiana Civil Code Article 476, appearing in Book II, "Things and the Different Modifications of Ownership, " directs: "One may have various rights in things: 1. Ownership; 2. Personal and predial servitudes; and 3. Such other real rights as the law allows." Article 477 of the Civil Code defines "ownership" as "the right that confers on a person direct, immediate, and exclusive authority over a thing." Article 477 further states: "The owner of a thing may use, enjoy, and dispose of it within the limits and under the conditions established by law."[14]

The right of ownership, which according to traditional civilian doctrine includes the elements of usus, fructus, and abusus, may lawfully be dismembered in a variety of ways by the intent of the owner or by operation of law. **Richard v. Hall**, 03-1488 (La. 4/23/04), 874 So.2d 131, 144 (citing Exposé des Motifs, Title III: Personal Servitudes, La. Civ. Code Ann. (West 1980)). See also A. N. Yiannopoulos, 4 **La. Civ. L. Treatise**, Predial Servitudes § 1:1 (4th ed. 2014). The establishment of a personal servitude or a predial servitude results in dismemberment of ownership. See **Richard v. Hall**, 874 So.2d at 144; **Ross v. Ross**, 02-2984 (La. 10/21/03), 857 So.2d 384, 399. These dismemberments of ownership are real rights of enjoyment, which by their nature confer direct and immediate, *although limited*, authority over a thing belonging to another person.

---

[14] Subsequent to the 1888 and 1889 execution of the "Deed to Right of Way" contracts, under which Union Pacific's predecessor acquired the servitude of right of use on the plaintiffs' lands, the 1870 Civil Code property law articles were extensively revised, by: 1976 La. Acts, No. 103, effective January 1, 1977 (revising Title III, "Personal Servitudes" (previously, "Usufruct, Use and Habitation")); 1977 La. Acts, No. 514, effective January 1, 1978 (revising Title IV, "Predial Servitudes" (previously, "Predial Servitudes or Servitudes of Land")); 1978 La. Acts, No. 728, effective January 1, 1979 (revising Title I, "Things"); and 1979 La. Acts, No. 180, effective January 1, 1980 (revising Title II, "Ownership"). We cite herein to the current property law articles unless the prior law was significantly changed, in which case, the old law will be noted. See **Palomeque v. Prudhomme**, 95-0725 (La. 11/27/95), 664 So.2d 88, 92-93 (holding that the 1977 revision (to the law on predial servitudes) and the 1982 revision (to the law on acquisitive prescription) were applicable in that case, as no vested property rights were affected); **Louisiana Smoked Products, Inc. v. Savoie's Sausage and Food Products, Inc.**, 96-1716 (La. 7/1/97), 696 So.2d 1373, 1378 (applying the law in effect at the time the contract at issue was confected, finding that the obligations of parties to a contract are fixed at the time the contract is executed).

**Richard v. Hall**, 874 So.2d at 144-45.

Thus, the owner of a thing may transfer to another, in whole or in part, the right of enjoyment and of consumption of the thing. See Marcel Planiol and George Ripert, **Treatise on the Civil Law**, Vol. 1, Part 2, No. 2337, p. 384-85 (12th ed. 1939) (translated by the Louisiana State Law Institute with the authority of Librairie Générale de Droit et de Jurisprudence, Paris (1959)). If the owner transmits *all* of his rights, it is said that he alienates the thing - he performs an act translative of ownership. If the owner grants merely a right of partial enjoyment of the thing, he dismembers his ownership - he creates upon the thing a real right of servitude. He is still owner but his ownership has been dismembered - someone else has a part of his rights upon the thing. See **id.** See also **Union Oil & Gas Corporation of Louisiana v. Broussard**, 237 La. 660, 683, 112 So.2d 96, 104 (La. 1959) ("[O]ne may dismember the ownership of his property and dispose of each separate dismemberment as he pleases . . . ."). "The right of ownership may be subject to a resolutory condition, and it may be burdened with a real right in favor of another person as allowed by law. The ownership of a thing burdened with a usufruct is designated as naked ownership." LSA-C.C. art. 478.

A right of way granted to a public railroad does not transfer ownership of the affected property under Louisiana law, unless the deed itself evidences that the parties intended otherwise. See **Texas & Pac. Ry. Co. v. Ellerbe**, 199 La. 489, 491-92, 6 So.2d 556, 557 (La. 1942); **Bond v. Texas & P. R. Co.**, 181 La. 763, 160 So. 406 (La. 1935). A railroad's right of way is a "limited personal servitude,"[15] rather than a predial servitude.[16] See **Farrell v. Hodges Stock**

---

[15] There are two kinds of servitudes: personal servitudes and predial servitudes. LSA-C.C. art. 533. A personal servitude is a charge on a thing for the benefit of a person. There are three sorts of personal servitudes: usufruct, habitation, and right of use. LSA-C.C. art. 534.

[16] A predial servitude is a charge on a servient estate for the benefit of a dominant estate. The two estates must belong to different owners. LSA-C.C. art. 646. If a servitude is imposed on an estate in favor of a person, rather than in favor of another estate, it is not a predial servitude but a

**Yards, Inc.**, 343 So.2d 1364, 1371 (La. 1977); **Parkway Development Corporation v. City of Shreveport**, 342 So.2d at 153-54;[17] **Board of Commissioners of Port of New Orleans v. Illinois Central Gulf Railroad Company**, 379 So.2d 838, 841 (La. App. 4 Cir.), writ denied, 380 So.2d 1210 (La. 1980). A "limited personal servitude" is a "real right"[18] that confers on a person limited advantages of use or enjoyment over an immovable belonging to another person. See LSA-C.C. art. 639, 1976 Revision Comment (c). A servitude of this type is denominated by LSA-C.C. art. 639 as a "personal servitude of right of use." See **Farrell v. Hodges Stock Yards, Inc.**, 343 So.2d at 1371 n.6.

Louisiana's Civil Code recognizes in Article 481 that "[t]he ownership and the possession of a thing are distinct. Ownership exists independently of any exercise of it and may not be lost by nonuse . . . ."[19] A corollary of this principle is stated in LSA-C.C. art. 639, which provides: "The personal servitude of right of use confers in favor of a person a specified use of an estate *less than full enjoyment*." (Emphasis added.) Clearly, one acquiring a personal servitude does *not* acquire the exclusive authority conveyed only by ownership. See LSA-C.C.

---

personal servitude of right of use, pursuant to LSA-C.C. arts. 639-645. See LSA-C.C. art. 646, 1977 Revision Comment (e).

[17] In **Parkway Development Corporation v. City of Shreveport**, 342 So.2d at 153-54, this court concluded that, because an 1888 grant gave the plaintiff/railroad the right to "occupy and use" a tract of land, the grant conferred on the railroad a "limited personal servitude." This court explained that the right was denominated as "personal" in the sense that the right is given for the benefit of a person rather than an estate. Such a servitude was, nevertheless, concluded to be a "real right" since a "limited personal servitude" confers on a person limited advantages of use or enjoyment over an immovable belonging to another person.

[18] "Real rights" are an established category of important patrimonial interests. The term "real right" is employed in the Civil Code, in the Code of Civil Procedure, and in Louisiana jurisprudence; yet, it has not been legislatively defined. 2 **La. Civ. L. Treatise**, § 203. The term "real right" under the civil law defines the relation of man to things. A "personal right," on the other hand, defines a person's relationship to another person and refers merely to an obligation one owes to another. See **Reagan v. Murphy**, 235 La. 529, 541, 105 So.2d 210, 214 (La. 1958).

[19] See LSA-C.C. art. 3448 ("Prescription of nonuse is a mode of extinction of a real right other than ownership as a result of failure to exercise the right for a period of time.").

13

art. 477; **Richard v. Hall**, 874 So.2d at 144-45.[20]

Further, pursuant to LSA-C.C. art. 645, "[a] right of use is regulated by application of the rules governing usufruct and predial servitudes to the extent that their application is compatible with the rules governing a right of use servitude." Two pertinent articles appearing in the rules governing predial servitudes include Articles 743 and 748, which provide:

> **Art. 743. Accessory rights**
> Rights that are necessary for the use of a servitude are acquired at the time the servitude is established. *They are to be exercised in a way least inconvenient for the servient estate*.
>
> * * *
>
> **Art. 748. Noninterference by the owner of servient estate**
> *The owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude*.
> If the original location has become more burdensome for the owner of the servient estate, or if it prevents him from making useful improvements on his estate, he may provide another equally convenient location for the exercise of the servitude which the owner of the dominant estate is bound to accept. All expenses of relocation are borne by the owner of the servient estate.

(Emphasis added.)

When both Article 743 and Article 748 are applied to the right of use servitude at issue in this case, only by maintaining the existing private crossings is inconvenience to the parties (both the plaintiffs and Union Pacific) minimized. The plaintiff/landowners (who would be inconvenienced by the removal of the private crossings, in having to leave their property and travel via public roadways to reach the remainder of their property on the opposite side of the railroad tracks) would continue to be able to access their property directly via the railroad crossings if the private crossings are maintained; thus, Union Pacific's exercise of the right of use servitudes continues to be "in a way least inconvenient for the

---

[20] See also Former LSA-C.C. art. 658 ("The part of an estate upon which a servitude is exercised does not cease to belong to the owner of the estate; he who has the servitude has no right of ownership in the part, but only the right of using it. Hence the soil of public roads belongs to the owner of the land on which they are made, though the public has the use of them . . . .").

servient estate[s]," as directed by Article 743.  Correspondingly, the continued use by the plaintiffs of the private railroad crossings, in existence at the time the instant dispute arose, "do[es] nothing tending to *diminish* or make *more* inconvenient the use of the servitude[s]," in accord with Article 748.  (Emphasis added.)  In other words, because the private railroad crossings already exist and the plaintiffs already use them, the continued use does not *diminish* Union Pacific's activities on its right of use servitudes, nor does the continued use of the private crossings by the plaintiffs *increase* the inconvenience to Union Pacific since it already maintains the private crossings.

Notably, however, the counterpart to current LSA-C.C. art. 645 (directing that Articles 743 and 748, along with the other articles on predial servitudes, be applied to rights of use), was former Article 628 (in effect in 1888, 1889, and 1910 when the deeds at issue were executed[21]), which provided only:  "The rights of use and habitation are established and extinguished in the same manner as usufruct." No article in the prior 1870 Civil Code provisions on rights of use (former Articles 626, 628-639, 644, and 645) stated that the rules governing predial servitudes were also applicable to a right of use servitude, as current LSA-C.C. art. 645 now provides.

Another difference between current property law and the law preceding the revisions referenced hereinabove is found in the contrast between current Civil Code Article 644 and former Civil Code Article 612 (relating to usufructs, but made applicable to rights of use by former Article 628, supra).  While current Article 644 provides that "[a] right of use is not extinguished at the death of the

---

[21] Although one of the deeds filed into the record was executed in 1910, it did not appear to have been the original title document by which the railroad acquired the right of use for its railroad, since it was stated in the 1910 contract that it was executed because "there is, at present, confusion and a lack of uniformity as to *the extent of* the right of way. . . ."  (Emphasis added.) The fact that only the "extent" of the right of way was at issue implied the prior existence of the right of way.  Further, all of the other contracts, appearing in the record, granted the right of use to "Houston, Central Arkansas & Northern Railway Company," while the 1910 contract was in favor of "Saint Louis, Iron Mountain and Southern Railway Company."

natural person or at the dissolution of any other entity having the right unless the contrary is provided by law or contract," former Article 612 expressly stated that "[i]f . . . corporations, congregations or other companies are suppressed, abolished or terminate . . . the usufruct ceases . . . ." In addition, former Article 612 also stated that a right "granted to corporations, congregations or other companies," which is "deemed perpetual," "lasts only thirty years." This latter concept was carried forward in current Article 608 (relating to usufructs, but made applicable to rights of use by current Article 645, supra), which provides in pertinent part: "In any event, a usufruct in favor of a juridical person shall terminate upon the lapse of thirty years from the date of the commencement of the usufruct."

Yet another difference is found in current LSA-C.C. art. 643, which allows a right of use servitude to be transferred, stating, "The right of use is transferable unless prohibited by law or contract." However, under prior law the right of use could not be transferred, as former Article 638 provided: "There is this difference between the person who has the use and the usufructuary, that the person who has the use can neither transfer, let, nor give his right to another."

The question raised relative to these three significant changes in Louisiana property law is whether the revisions are substantive, procedural, or interpretive. See LSA-C.C. art. 6 ("In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary."). If the prior law were to be applied to the instant case, the possible inapplicability of LSA-C.C. art. 743 ("Rights that are necessary for the use of a servitude . . . are to be exercised in a way least inconvenient for the servient estate.") and LSA-C.C. art. 748 ("The owner of the servient estate may do nothing tending to diminish or make more inconvenient the use of the servitude.") would not affect the result we reach herein, as the railroad company would nonetheless

16

lack exclusivity over the property on which it has a right of use, and the landowners retain ownership of the property beneath the railroad tracks, subject only to Union Pacific's right of use, entitling the landowners, at the very least to cross over the tracks to reach their property on the other side. However, if former LSA-C.C. art. 612 ("The usufruct which is granted to corporations . . . or other companies, which are deemed perpetual, lasts only thirty years.") and former LSA-C.C. art. 638 ("There is this difference between the person who has the use and the usufructuary, that the person who has the use can neither transfer, let, nor give his right to another.") were applied to this case, the original grant of a right of use to Union Pacific's predecessor railroad company would have been limited to a thirty-year duration, and the right of use servitudes could not have been transferred to another company (unless the deed so provided). To the extent these changes in Louisiana's property law would disturb vested rights of the landowners, the revision of the law would not be applicable. See **Louisiana Smoked Products, Inc. v. Savoie's Sausage and Food Products, Inc.**, 96-1716 (La. 7/1/97), 696 So.2d 1373, 1378.[22]

While we note these differences between the current property laws and those in existence at the time the instant "Deed[s] to Right of Way" were confected, we leave for the federal courts to determine whether the revisions to the cited laws touch upon any of the matters raised by the parties in this case.

We turn now to an application of Louisiana's property law to the facts of the instant case, vis-à-vis whether a recognized species of property right belonging to Union Pacific has been affected.

The contracts between Union Pacific's predecessor(s) and the landowners,

---

[22] See also LSA-Const. Art. I, § 23 ("No bill of attainder, ex post facto law, or law impairing the obligation of contracts shall be enacted."); **State, Department of Highways**, 247 La. 188, 170 So.2d 371 (La. 1965) (holding 1956 La. Acts, No. 555, which enacted LSA-R.S. 9:2971-9:2973, unconstitutional insofar as it applied to divest ownership rights acquired prior to the effective date of the legislation).

entitled "Deed to Right of Way," generally stated as follows, in pertinent part:[23]

> For and in consideration of the sum of one dollar, and in consideration of the further fact that the Houston, Central Arkansas and Northern Railway Company propose to build its contemplated road over and across the following described land, to-wit:
>
> * * *
>
> Situated in Ouachita Parish, State of Louisiana: Now, if the said line of road, shall pass over the above lands, then and in that event, I hereby sell and grant the said Company *the right of way*, of one hundred feet in width, over the same, if cleared, and one hundred and fifty feet if in woods, for the consideration expressed above. It being understood that said Company shall pay damages for buildings, fencing and orchards, which may be included in the right of way, when same are destroyed by the Company. [Emphasis added.]

In addition, several of the deeds expressly reserved to the landowners the right to cultivate the land within the right of way (by language stating "up to the railroad track" or "on said right of way on each side of road bed - as near to said road bed as may be convenient"), as long as the tracks were not damaged. In only one deed, filed into the record, did the railroad company expressly state that it would install and maintain "crossings on the road through said plantation." Further, in several of the deeds the railroad company agreed to install fencing or cattle guards against the intrusion of farm animals and/or to construct ditches so that the natural drainage was maintained. Significantly, none of the deeds stated that the railroad company was acquiring the *exclusive* right to use the lands subject to its "right of way."

Based on the applicable Louisiana property law set forth hereinabove, the "Deed[s] to Right of Way," granted to the railroad company named therein, a right

---

[23] All but two of the deeds contained these general terms, with only a few alterations, and were executed in 1888 and 1889. None of these general form deeds, containing the language quoted above, included any provision that would convey an interest to any successor or assignee of the railroad company named therein, Houston, Central Arkansas and Northern Railway Company. Of the two deeds that were not in the general form quoted, one was executed in 1889 and conveyed only a fifty foot "right of way" in exchange for the "sum of three hundred dollars cash"; this deed also conveyed the interest to the named railroad company and its "assigns." The other non-standard form contract was, as mentioned hereinabove, executed in 1910 and stated that "there is, at present, confusion and a lack of uniformity" as to the extent of the right of way of the "Saint Louis, Iron Mountain and Southern Railway Company"; this deed also conveyed the interest to the named railroad company and "its successors and assigns."

of use servitude across the respective lands. Therefore, subsequent acquisition by Union Pacific of the right of use servitudes would have given to Union Pacific a real right in the property and, thus, standing to assert a "taking" claim.

Whether the Affected Property has been Taken or Damaged in a Constitutional Sense

Next, we examine the second prong for the assertion of a Article I, Section 4 challenge: whether the property has been taken or damaged in a constitutional sense.

Despite the absence of express agreements for the installation of private crossings in all but one of the deeds at issue in this case, the railroad company did, in fact, construct private crossings for the convenience of the plaintiffs' ancestors-in-title. The affirmative actions of the railroad company, in building these private crossings, give rise to the inference that the railroad company did not previously claim the exclusive right to use the lands subject to its right of use.[24]

Considering the fact that the railroad company constructed the private railroad crossings for the benefit of the landowners, whose land was subject to the railroad company's right of use, along with the fact that these landowners and their successors-in-interest have used the private crossings for more than 100 years, it may be inferred that it was the intent of the parties, in contracting for the right of use servitudes, that private crossings would be provided for the convenience of the landowners.

_____

[24] The extent and manner of use of conventional servitudes, established by title, are primarily determined in accordance with the intent of the parties as expressed in the provisions in the title. 4 **La. Civ. L. Treatise,** § 7:2. "If the title is silent as to the extent and manner of use of the servitude, the intention of the parties is to be determined in the light of its purpose." LSA-C.C. art. 749. Ambiguities in the title may be resolved by suppletive provisions of the Civil Code, the situation of the estates, and past acts of use and possession. **Id.** (citing **2800 Associates, L.L.C. v. Eagle Equity Limited Partnership # 3**, 10-687 (La. App. 5 Cir. 3/29/11), 64 So.3d 283 (determining the manner of use of a servitude in light of its past use); **Watson v. Eaglin**, 606 So.2d 87, 88 (La. App. 3 Cir. 1992) ("[W]here the title was silent as to the manner of use of a servitude of passage, resort may be made to the previous use to interpret the title.")). The title is not always controlling because the owner may have acquired additional rights by prescription or "the servitude may have been modified by verbal or written juridical act." See 4 **La. Civ. L. Treatise**, § 7:2.

Furthermore, Louisiana has historically imposed on railroads the duty to construct "usual and necessary" safeguards, such as private crossings and cattle-guards, even though not expressly contracted-for by the parties. See **Heath v. Texas & Pacific Railway Company**, 37 La. Ann. 728, 1885WL6137 (La. 1885) ("A railway-company must so build its road-bed as not to needlessly injure the land over which it passes. It cannot obstruct drainage with impunity. It must make crossings and cattle-guards on pain of responsibility for damage caused by the omission to make them . . . . [The plaintiffs] are entitled to these safeguards that are usual and necessary as much as if expressly stipulated. They are a part of the fixtures that custom and necessity requires for the operation of railroads through open cultivated fields."); **Kirk v. Kansas City, S. & G. Ry. Co.**, 51 La. Ann. 664, 25 So. 463 (La. 1899).[25]

As stated in the foregoing discussion, we must conclude that the plaintiff/landowners continue to own the property beneath the railroad tracks, and the railroad company received only the right of use of the landowners' property and provided private crossings for the landowners' convenience so they might cross the tracks when not in use by the railroad company. Consequently, the principle stated in **Avenal v. State**, 886 So.2d at 1106, applies with equal force here: "Thus, the [landowner] could not take [his] own property."

Union Pacific's contention that it is now entitled to *exclusive* use of the land on which it only has a right of use servitude is clearly without merit. A right of use, under Louisiana law, is a limited personal servitude, not ownership. The

---

[25] See also **Illinois Central R. Co. v. Louisiana Public Service Commission**, 224 La. 279, 286, 69 So.2d 43, 46 (La. 1953) ("Implicit in the charter and franchise of the railroad company is the implied condition that it is granted subject to the right of the State, in the exercise of its police power, to establish and authorize new works necessary and subservient to the convenience and safety of its citizens which might cause damage to the property of the railroad. To this end, the State has the power to require of the railroad the uncompensated duty of constructing and maintaining all such crossings over its right of way as are reasonable and necessary for the public.").

plaintiff/landowners retain ownership of the property at issue.[26]  Union Pacific's attempt to gain *exclusive* use of the land burdened by its servitude (by contending that requiring it to leave in place the private railroad crossings, which have been in place for decades for the plaintiff/landowners' use, is a "taking") turns the constitutional "taking" law on its head.  To deny the plaintiff/landowners the simple right to cross over the tracks to reach the remainder of their property when there are no trains on the tracks (in other words, when Union Pacific is not *using* its right of use servitude) would change the nature of the right Union Pacific possesses from mere use to something more closely resembling ownership.  If Union Pacific obtains what it seeks - exclusive use of the property – it, not the plaintiff/landowners, seemingly will have accomplished an inverse condemnation, not having complied with expropriation procedures, and there is no indication that "just compensation" was paid to the plaintiff/landowners "to the full extent of [their] loss," as required by LSA-Const. Art. I, § 4.

We find no merit in Union Pacific's contention that the continuance of the private crossings at issue in this case constitutes a constitutional taking.

However, Union Pacific also asserts that the application of LSA-R.S. 48:394, in prohibiting it from closing private crossings without first submitting to the requisite administrative process (i.e., providing 180-day advance notice to the LPSC and affected landowners and participating in a public hearing), constitutes a temporary physical taking.

A person's right to acquire, own, control, use, enjoy, protect, and dispose of private property, as recognized in LSA-Const. Art. I, § 4, is expressly made "subject to reasonable statutory restrictions and the reasonable exercise of the police power."  In furtherance of its police power, the Louisiana Legislature has

---

[26] If the servitude were to terminate, pursuant to LSA-C.C. arts. 526, 601, and 628, the railroad company would be entitled to remove the constructions placed upon the plaintiff/landowners' property, and the full use of the property would return to the owners.

21

enacted numerous regulations of railway companies operating in this state, including LSA-R.S. 45:354 (enacted by 1902 La. Acts, No. 73, § 1), which provides:

> **§ 354. Foreign corporations operating in state to be subject to its jurisdiction**
> Railroad companies or corporations availing themselves of the provisions of R.S. 45:352 and 45:353 shall maintain a domicile, and main and general offices in Louisiana, and are *subject to the control and regulations of the laws of Louisiana and the Louisiana Public Service Commission*. [Emphasis added.]

The LPSC was created by former Article VI, Section 3 of the Constitution of 1921, as the successor of the Railroad Commission, and the authority of the new commission was extended to also give it the power of supervision, regulation and control over local public utilities (specifically, street railways, gas, electric light, heat, power, and waterworks).[27] **Id.** See also LSA-Const. Art. IV, § 21(B) ("The commission shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law. It shall adopt and enforce reasonable rules, regulations, and procedures necessary for the discharge of its duties, and shall have other powers and perform other duties as provided by law.")

We further note 49 U.S.C.A. § 20106, which provides, in pertinent part:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order--
> (A) is necessary to eliminate or reduce an essentially local safety or security hazard;

---

[27] The regulation of railroad companies operating in Louisiana is long-standing. We note that the Railroad Commission of Louisiana was the predecessor regulatory agency to the LPSC; however, the Railroad Commission's power was confined, by Article 284 of the Constitution of 1898 and of 1913, to railroads, steamboats and other water craft, sleeping cars, passenger and freight tariffs and service, express rates, and telephone and telegraph charges. See **State v. City of New Orleans**, 151 La. 24, 26, 91 So. 533 (La. 1922). Regulatory authority over railroad track crossings was also exercised by the Railroad Commission. See **Gulf, C. & S. F. Ry. Co. v. Louisiana Public Service Commission**, 151 La. 635, 639, 92 So. 143, 144 (La. 1922).

(B) is not incompatible with a law, regulation, or order of the United States Government; and

(C) does not unreasonably burden interstate commerce.

Clearly, with respect to railroad crossings, Louisiana has a significant safety interest in keeping open crossings, the absence of which would result in the diversion of vehicular traffic onto public roadways, which presents an increased hazard when the traffic so diverted consists of over-sized, and often heavily loaded, farm equipment.

Moreover, the "enforcement of uncompensated obedience to a regulation passed in the legitimate exertion of the police power is not a taking of property without due process of law." See **New Orleans Public Service v. City of New Orleans**, 281 U.S. 682, 687, 50 S.Ct. 449, 450, 74 L.Ed. 1115 (1930) (wherein a New Orleans city ordinance, requiring the plaintiff street railway company to tear down a "viaduct" railway crossing and to replace it with a "grade" crossing, was upheld as being a reasonable exercise of the city's police power, in determining what safety precautions were necessary or appropriate under the circumstances).

With respect to Senate Bill 243, which became LSA-R.S. 48:394, the purpose of the bill was stated by its author, Senator Joe McPherson, in testimony before the Senate Committee on Transportation, as providing: a procedure for closing or removal of private railroad crossings, an "orderly process for the closure of farm crossings . . . [, and] an orderly method of notification." Senator McPherson stated that "[c]urrently, there is a posting of a notice on the closest light pol[e] or tree limb to the crossing and if the farmer or landowner happens to come by and sees it then that is their receipt of notification." Citing the absence of any governing law on notification in such circumstances, Senator McPherson stated that the bill would "provide proper notification and a hearing process before that closure occurs" and would provide "a means . . . to protect the citizens of

Louisiana."[28]   <u>See</u> Minutes, Committee on Transportation, Highways & Public Works, Louisiana Senate, 2008 Regular Session, S.B. 243, April 17, 2008 (testimony of Senator Joe McPherson).

The federal appellate court's summation of the purpose of LSA-R.S. 48:394 (that it was enacted "to balance the rights of the railroad company and the owners of private crossings by ensuring that the railroad companies do not unilaterally close private crossings unless doing so is necessary for the railroads to continue operating free from substantial burdens" (<u>see</u> **Faulk v. Union Pacific Railroad Co.**, 576 Fed.Appx. at 347)) comports with the text of the statute and the articulated legislative purpose.

Revised Statute 48:394 requires any railroad company desiring to close or remove a private crossing in Louisiana, to provide a written request, no less than 180 days prior to the proposed closing or removal, by registered or certified mail, to the LPSC and to the owner(s) of record of the private crossing(s) traversed by the rail line.   The written request must state the manner in which the private railroad crossing "unreasonably burdens or substantially interferes with rail transportation."   <u>See</u> LSA-R.S. 48:394(A)(1).[29]   Then, the LPSC must publish the

---

[28] Jim Harper, a farmer from Rapides Parish, producing sugar cane, rice, cotton, and corn, who was at that time vice president of the Louisiana Farm Bureau Federation, testified that the closure of railroad crossings by Union Pacific affected him personally, preventing him from accessing his fields.  Mr. Harper related that a closure was posted on his property, and he subsequently met with a railroad representative, informing the representative that he had no other access to his fields other than the railroad crossing; however, the crossing on his property was closed nonetheless.  Mr. Harper stated that, after the crossing was closed, he had to travel over a mile down the public highway, through the town of Cheneyville, a significant number of times per day with his farm equipment and harvested crops to get to his "loading site."  <u>See</u> Meeting, Committee on Transportation, Louisiana House of Representatives, 2008 Regular Session, May 19, 2008, S.B. 243, available at http://house.louisiana.gov/H_Video/2008/May2008.htm; Minutes, Committee on Transportation, Highways & Public Works, Louisiana Senate, 2008 Regular Session, April 17, 2008, S.B. 243 (testimony of Jim Harper).

[29] Louisiana Revised Statute 48:394 provides in full:

A. (1) Any railroad company operating in this state which desires to close or remove a private crossing shall, no less than one hundred eighty days prior to the proposed closing or removal, provide a written request by registered or certified mail to the Louisiana Public Service Commission and to the owner or owners of record of the private crossing traversed by the rail line. The written

24

railroad's written request in its official bulletin for no less than 25 days. See LSA-R.S. 48:394(A)(2).

Following publication of the railroad's request, LSA-R.S. 48:394(B) requires publication of a 15-day advance notice of hearing and an attempt by the LPSC to directly notify affected record landowners. See LSA-R.S. 48:394(B). Thereafter, a public hearing is held by the LPSC, during which "parties in interest" have an opportunity to be heard. The public hearing is required to be held not less than 60 days after receipt of the railroad's closure request. See **id**. If, after the public hearing, the LPSC determines that the private railroad crossing "unreasonably burdens or substantially interferes with rail transportation," the LPSC is required to publish a notice stating the manner of the crossing closure in the official journal of the parish where such crossing is located and in the LPSC's official bulletin. See LSA-R.S. 48:394(C).

An appeal from a decision of the LPSC is provided for by LSA-Const. Art.

_____

request shall state the manner in which such private railroad crossing unreasonably burdens or substantially interferes with rail transportation.

(2) The Louisiana Public Service Commission shall publish the written request from the railroad company in the commission's official bulletin for no less than twenty-five days.

B. No private crossing shall be closed or removed by any railroad company until after a public hearing by the Louisiana Public Service Commission at which parties in interest have had an opportunity to be heard. Notice of the time and place of the hearing shall be published in the official journal of the parish and the commission's official bulletin and at least fifteen days shall elapse between the publication and the date of the hearing. In addition to notice by publication, and at least ten days prior to the hearing, a good faith attempt to notify the owner or owners of record of the property where the private crossing is located shall be made by the commission by sending an official notice by registered or certified mail of the time and place of the hearing to the address or addresses indicated in the mortgage and conveyance records of the parish. The public hearing shall be held not less than sixty days after receipt of request of the railroad company as provided in Subsection A of this Section.

C. If, after such public hearing, the commission determines that the private railroad crossing unreasonably burdens or substantially interferes with rail transportation, the commission shall publish in the official journal of the parish where such crossing is located and in the commission's official bulletin a notice stating the manner in which such closure or removal shall be made and the date of such.

D. The provisions of this Section shall not apply when a private landowner or landowners and a railroad company enter into a consensual or negotiated written agreement or agreements to close a private railroad crossing.

IV, § 21(E),which states:

> Appeal may be taken in the manner provided by law by any aggrieved party or intervenor to the district court of the domicile of the commission. A right of direct appeal from any judgment of the district court shall be allowed to the supreme court. These rights of appeal shall extend to any action by the commission, including but not limited to action taken by the commission or by a public utility under the provisions of Subparagraph (3) of Paragraph (D) of this Section.

Article IV, Section 21(E) makes it clear that "any action" of the LPSC may be appealed to the district court, and any judgment of a district court sitting in review of an LPSC action is directly appealable to the Louisiana Supreme Court. See **Louisiana Power and Light Company v. Louisiana Public Service Commission**, 369 So.2d 1054, 1058 (La. 1979).

In light of these considerations, it cannot seriously be disputed that investing the LPSC with the authority to apply the relevant law, as stated in LSA-R.S. 48:394, to requests for private railroad crossing closures, is an exercise of this state's police power.

Nevertheless, LSA-R.S. 48:394 did not become effective until after the instant suit had been filed. Therefore, we will examine whether application of the statute could be retroactively applied in the instant case.

In the absence of contrary legislative expression, substantive laws apply prospectively only. Procedural and interpretative laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary. LSA-C.C. art. 6. Concomitantly, LSA-R.S. 1:2 ("No Section of the Revised Statutes is retroactive unless it is expressly so stated.") is construed as being co-extensive with LSA-C.C. art. 6. **Mallard Bay Drilling, Inc. v. Kennedy**, 04-1089 (La. 6/29/05), 914 So.2d 533, 543.

Louisiana's prohibition against legislation having retroactive effect applies

to substantive laws only.[30]  Procedural and interpretive laws may be applied retroactively, subject to the caveat that such laws may not operate to disturb a vested right.  **Ebinger v. Venus Construction Corporation**, 10-2516 (La. 7/1/11), 65 So.3d 1279, 1285.  Laws may not be applied retroactively if contractual obligations would be impaired or vested rights would be disturbed.  **M.J. Farms, Ltd. v. Exxon Mobil Corp.**, 07-2371 (La. 7/1/08), 998 So.2d 16, 29-30.

This court has interpreted the retroactivity provisions of LSA-C.C. art. 6 and LSA-R.S. 1:2 to require a twofold inquiry:  (1) we must ascertain whether the legislature expressed in the enactment its intent regarding retrospective or prospective application - if the legislature did so, our inquiry is at an end; (2) but, if the legislature did not, we must classify the enactment as substantive, procedural, or interpretive.  See **id.**, 998 So.2d at 29.  See also **Mallard Bay Drilling, Inc. v. Kennedy**, 914 So.2d at 543; **Unwired Telecom Corp. v. Parish of Calcasieu**, 03-0732 (La. 1/19/05), 903 So.2d 392, 404; **Cole v. Celotex Corporation**, 599 So.2d 1058, 1063 (La. 1992).

The Louisiana Legislature made no statement in 2008 La. Acts, No. 530, regarding the retroactivity of LSA-R.S. 48:394.  However, upon examination of its provisions and the legislative history referred to hereinabove, we conclude that the effect of LSA-R.S. 48:394 is procedural and therefore may be applied retroactively.  See **Dripps v. Dripps**, 366 So.2d 544, 548 (La. 1978) ("Some changes in the law are applicable to all situations, past, present and future.  Laws which determine jurisdiction and procedure are applicable, from the date of their promulgation, to all law suits, even to those which bear upon facts and acts of a prior date.  They even apply to pending lawsuits . . . .  These laws are remedial in

_____

[30] Although LSA-R.S. 1:2, unlike LSA-C.C. art. 6, does not distinguish between substantive, procedural, and interpretive laws, the jurisprudence has consistently construed the two provisions as being co-extensive, with LSA-R.S. 1:2 having limited applicability to substantive legislation.  **M.J. Farms, Ltd. v. Exxon Mobil Corp.**, 07-2371 (La. 7/1/08), 998 So.2d 16, 29.

character concerned with procedure, not substantive rights. They do not impair the obligations of contracts.") (citing Planiol, **Treatise on the Civil Law**, at No. 258, pp. 182-83).

Furthermore, there is no provision in LSA-R.S. 48:394 authorizing the LPSC to render an opinion relative to the substantive property rights of parties involved in a private railroad crossing closure dispute. The purpose of LSA-R.S. 48:394 is merely to ensure that all affected parties receive sufficient notice of an impending private railroad crossing closure, so that interested parties have an opportunity to be heard at a public hearing. The LPSC's adjudicatory responsibility at the time of the public hearing is to determine whether or not federal preemptive law mandates closure of the private railroad crossing, by application of the standard set forth in the statute. The LPSC must determine whether a particular "private railroad crossing unreasonably burdens or substantially interferes with rail transportation"; if it does, then closure must be ordered.[31] The legislature's insertion of the non-discretionary standard into LSA-R.S. 48:394 resulted from, and was in accord with, the U.S. Fifth Circuit's holding that federal law preempts state regulation of private crossings that "unreasonably burden[s] or interfere[s] with rail transportation." See **Faulk v. Union Pacific Railroad Co.**, 576 Fed.Appx. at 346-47; **Franks Investment Company v. Union Pacific Railroad Co.**, 593 F.3d at 414.

As previously noted, a method of appealing any decision of the LPSC is set forth in LSA-Const. Art. IV, § 21(E), which encompasses an LPSC decision resulting from an action instituted pursuant to LSA-R.S. 48:394. Further, the provisions of LSA-R.S. 48:394 do not prohibit interested parties from litigating

---

[31] We agree with the federal district court that "the legislative policy of La.Rev.Stat. 48:394 is clear. The legislative policy is to prevent railroads from closing private railroad crossings when there is no substantial need for the closure." See **Faulk v. Union Pacific Railroad Company**, 2011WL777905 at p.11, supra.

any substantive issues arising out of their respective property rights in another forum;[32] a railroad company is only required to submit to regulatory review prior to closure of a private railroad crossing. An order of closure is automatic under the statute, if the railroad company can establish that the private railroad crossing unreasonably burdens or substantially interferes with rail transportation.

We conclude that LSA-R.S. 48:394 is procedural, as it merely directs the steps that must be taken, and the forum that must first approve, the closure of a private railroad crossing.

There has been no showing that giving this procedural law retroactive effect in the instant case impairs contractual obligations or disturbs vested rights. Although Union Pacific has argued that it had the right to close the crossings at its discretion before the enactment of LSA-R.S. 48:394 and that LSA-R.S. 48:394 now impairs this right, the Louisiana property law discussed herein does not support the exclusivity of use over the landowners' property sought by Union Pacific. Therefore, we find no merit in Union Pacific's contention.

We further note that federal jurisprudence recognizes that compensation may be required when a government *regulation* of private property is so onerous that its effect is tantamount to a direct appropriation or ouster.[33] See **Lingle v. Chevron U.S.A. Inc.**, 544 U.S. 528, 536-37, 125 S.Ct. 2074, 2080, 161 L.Ed.2d 876 (2005). Except to the extent that background principles of nuisance and property law independently restrict an owner's intended use of property, two categories of

---

[32] See LSA-Const. Art. V, § 16 (vesting district courts with original jurisdiction of all civil matters); **Moore v. Roemer**, 567 So.2d 75, 79 (La. 1990) (holding that the legislature cannot divest district courts of original jurisdiction over civil matters).

[33] Although we do not apply U.S. Supreme Court decisions mechanically to state law issues, even when the state and federal constitutions are similarly or identically worded, such decisions serve as guideposts, and we use them "if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees." See **Price v. U-Haul Company of Louisiana**, 98-1959 (La. 9/8/99), 745 So.2d 593, 598 (citing **State v. Hernandez**, 410 So.2d 1381, 1385 (La. 1982); William J. Brennan, Jr., State Constitutions and Protections of Individual Rights, 90 Harv.L.Rev. 489, 502 (1977)).

regulatory action have generally been deemed to be per se takings or "total regulatory takings," requiring compensation: (1) when government requires an owner to suffer a permanent physical invasion of property, however minor; and (2) when a regulation completely deprives an owner of all economically beneficial use of property. See **id.**, 544 U.S. at 538, 125 S.Ct. at 2081 (citing **Loretto v. Teleprompter Manhattan CATV Corp.**, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982); **Lucas v. South Carolina Coastal Council**, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). See also **Arkansas Game and Fish Commission v. U.S.**, ___ U.S. ___, ___, 133 S.Ct. 511, 517, 184 L.Ed.2d 417 (2012); **Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection**, 560 U.S. 702, 713, 130 S.Ct. 2592, 2601, 177 L.Ed.2d 184 (2010). Furthermore, in general, temporary government action may give rise to a takings claim if permanent action of the same character would constitute a taking. **Arkansas Game and Fish Commission v. U.S.**, ___ U.S. at ___, 133 S.Ct. at 517.

However, no magic formula enables a court to judge, in every case, whether a given government interference with property is a taking. In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the courts have recognized few invariable rules in this area. Most takings claims turn on situation-specific factual inquiries. **Id.** Some considerations for determining whether a taking has occurred include: the character of the land at issue; the property owner's distinct investment-backed expectations, a matter often informed by the law in force in the state in which the property is located; and the degree to which the invasion is intended or is the foreseeable result of authorized government action. See **id.**, ___ U.S. at ___, 133 S.Ct. at 517.

Nevertheless, Supreme Court regulatory takings jurisprudence instructs that

30

when a complainant has not yet obtained a final administrative decision, the economic impact of the challenged action and the extent to which it interferes with reasonable investment-backed expectations cannot be evaluated until the administrative agency has arrived at a final, definitive position regarding how it will apply the regulatory law at issue to the particular property in question. See **Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City**, 473 U.S. 172, 190-91, 105 S.Ct. 3108, 3118-19, 87 L.Ed.2d 126 (1985).

A property owner may not establish a taking before the regulatory agency charged with the decision-making authority has the opportunity, using its own reasonable procedures, to decide and explain the reach of a challenged regulation. See **Palazzolo v. Rhode Island**, 533 U.S. 606, 620-21, 121 S.Ct. 2448, 2459, 150 L.Ed.2d 592 (2001). Under the "ripeness" doctrine, a "taking" claim based on a law or regulation that is alleged to go too far in burdening property depends upon the landowner having first followed reasonable and necessary steps to allow the regulatory agency to exercise their full discretion in considering the matter at issue, including the opportunity to grant any variances or waivers allowed by law. **Id.** As a general rule, until these ordinary processes have been followed, the extent of the restriction on property is not known, and a regulatory taking has not yet been established. **Id.**

In the instant case, Union Pacific failed to submit the matter to the regulatory authority designated by the governing statute, LSA-R.S. 48:394, the LPSC, depriving the LPSC of the opportunity to grant Union Pacific the right to close the railroad crossings at issue. If Union Pacific's request is granted, there can be no claim of a regulatory "taking." Until the LPSC rules on Union Pacific's intent to close the private crossings at issue, Union Pacific's "taking" claim, as to LSA-R.S. 48:394, is not ripe for adjudication.

31

Having found that Union Pacific failed to establish that a constitutionally prohibited taking has occurred, either in the continued existence of the private crossings at issue or in the regulatory procedure before the LPSC established by LSA-R.S. 48:394, we find it unnecessary to address the final prong (whether any alleged regulatory taking occasioned by LSA-R.S. 48:394 is for a public purpose) of the three-prong analysis set forth in **State, Department of Transportation and Development v. Chambers Investment Company**, supra. Accordingly, we conclude that LSA-R.S. 48:394, as applied to the instant case, has not effected an unconstitutional taking under LSA-Const. Art. I, § 4.

## DECREE

We have answered the certified question as set forth in this opinion. Pursuant to Rule XII, Supreme Court of Louisiana, the judgment rendered by this court upon the question certified shall be sent by the clerk of this court under its seal to the United States Court of Appeals for the Fifth Circuit and to the parties.

**CERTIFIED QUESTION ANSWERED.**

**06/30/15**

# SUPREME COURT OF LOUISIANA

## NO. 2014-CQ-1598

## R.T. FAULK, III, COREY FARMS, L.L.C.; FAULK FARMS, INCORPORATED; JOANNE HODGES; RIVER VALLEY PROPERTIES; MCHENRY FARMS, L.L.C.; SHERMAN SHAW; T.P. GODWIN; WILLIAM G. NADLER; MCHENRY REALTY PARTNERSHIP

## VERSUS

## UNION PACIFIC RAILROAD COMPANY

*ON CERTIFIED QUESTION FROM THE UNITED STATES
FIFTH CIRCUIT COURT OF APPEALS*

**WEIMER, J.**, concurs.

I concur in those portions of the opinion which specifically hold that La. R.S. 48:394 has not effected an unconstitutional taking of private property as applied to the facts of this case.